BURRIS, Exr., Appellant,

v.

LERNER, Appellee, et al.

[Cite as *Burris v. Lerner* (2000), 139 Ohio App.3d 664.]

Court of Appeals of Ohio,
Eighth District, Cuyahoga County.

No. 76743.

Decided Aug. 14, 2000.

*Nurenberg, Plevin, Heller & McCarthy Co., L.P.A., William S. Jacobson* and *Kathleen J. St. John,* for appellant.

*Reminger & Reminger Co., L.P.A., Gary H. Goldwasser* and *Brian D. Sullivan,* for appellee.

---

JAMES M. PORTER, Judge.

Plaintiff-appellant Agnes Burris, executor of the estate of Earnest Burris, deceased, appeals from the summary judgment entered in favor of defendant-appellee Raisa Lerner, M.D., on of a medical malpractice claim based on the death of the decedent from a heart attack. Plaintiff claims that disputed issues of material fact precluded summary judgment for the defendant. We agree and reverse and remand for the reasons stated below.

On February 4, 1995, Dr. Lerner saw Earnest Burris, a regular patient of hers, for a chief complaint of left shoulder pain radiating down his arm. Dr. Lerner initially diagnosed the pain as musculo-skelatal. Dr. Lerner noted, however, that Mr. Burris had multiple risk factors for coronary artery disease, such as family history, was overweight, had hypertension and diabetes mellitus, was African–American, and had a deficient potassium level. Burris informed Dr. Lerner at the appointment that he was concerned that his shoulder pain was related to his heart.

Dr. Lerner scheduled Burris for a thallium stress test to determine blockage of key heart arteries. The test was conducted in the nuclear radiology area of Mt. Sinai Hospital on February 16, 1995. The test was conducted in the presence of a nurse and cardiology fellow, Dr. Nandra. The results were read later that day by the board-certified cardiologist on duty, co-defendant, Michael Rocco, M.D.

Dr. Rocco testified on deposition that, although he was not present for the stress test, he interpreted the results of the test, as was his practice. Dr. Rocco testified that he typically prepares and finalizes his report interpreting the stress test the night of the test consistent with hospital policy, as well as his own practices. In this instance, Dr. Rocco testified that the report (though not the typed copy) would have been interpreted and signed off on by him sometime on the evening of February 16, 1995, probably between 6:00 and 8:00 p.m.

The results of Burris's thallium stress test, as interpreted by Dr. Rocco the evening of February 16, 1995, were "abnormal," in that "[Mr. Burris] had a significant hypertensive response to exercise * * *. He had a thallium scan which showed both fixed and redistributing defects which were suggestive of either cardiomyopathy or potentially ischemia in the absence of inducible symptoms of ischemia or diagnostic EKG changes."

Dr. Rocco, moreover, testified that he did not "qualitatively" disagree with the following interpretation of Mr. Burris's thallium scans by the neuroradiologist, Dr. Pryce, which clearly indicated the presence of ischemia:

" * * . * Abnormal exercise thallium scans with fixed basal interior defect, partially redistributing anterolateral and septal defects and redistributing anterior, anterolateral, anteroseptal and interior, paren, mid to apical defects, closed paren. Findings are consistent with multi-vessel coronary artery disease with previous myocardial infarction and large amount of reversible myocardial ischemia."

When asked whether he disagreed in any respect with the foregoing interpretation of the thallium scan in this case, Dr. Rocco testified:

"A. Maybe in terms of the magnitude of the redistribution and the distribution, yes, but I think qualitatively—

"Q. It's correct?

"A. I agree with most of that, yes. But the nuclear scan looked at in isolation is consistent with these findings.

"Q. Which findings, the findings I've read to you?

"A. With possible prior myocardial infarction and ischemia."

Dr. Rocco further testified that, in light of the abnormalities in Burris's test results, it would have been his custom and practice to have called the referring physician, Dr. Lerner, at the time that he was reviewing the scans. Specifically, Dr. Rocco testified that it is his custom and practice to call the referring physician the very evening that he was interpreting the test results "[i]f there was a test that's abnormal or I feel a test that is of moderate probability for a problem and requires further evaluation." Dr. Rocco testified that, although he

has no express recollection of calling Dr. Lerner in this case, and although, in February 1995, he was not in the habit of making notes of such calls, he nonetheless believes that he did call Dr. Lerner the night of Burris's test (February 16, 1995) because it was his policy to call with a test of this nature as he "felt that this test was not totally normal and warranted further evaluation." Dr. Rocco further testified, based on his custom and practice, that if he had not been able to reach Dr. Lerner that evening, he would have left a message with her answering service asking her to call him.

Dr. Lerner testified on her deposition that she has a clear recollection that Dr. Rocco did not call her on the evening of February 16, 1995. Dr. Lerner did acknowledge, however, that if Dr. Rocco had called and left a message with her answering service, even if he had not told the service that the message was urgent, Dr. Lerner would have received his message by the next morning, February 17, 1995, sometime between 8:30 and 9:00 a.m. Dr. Lerner had no contact with Mr. Burris that day and contends she was not advised of the abnormality discovered on the thallium scans.

Mr. Burris died of a myocardial infarction the evening of February 17, 1995. He was found dead on the floor of his garage after returning from an errand.

It was Dr. Lerner's position on the summary judgment proceedings that she never received a call from Dr. Rocco and that even if she had been informed of the stress test results, she still would have had no duty to hospitalize Burris prior to his death because "Dr. Rocco would have recommended that the patient be further evaluated within a few days, as there was no urgency."

The plaintiff, in opposition to Dr. Lerner's motion for summary judgment, offered the affidavit and expert opinion of Jeffrey S. Garret, M.D., who stated:

"1. I am a Board Certified Cardiologist licensed to practice medicine in the State of Pennsylvania;

"2. I devote in excess of 50% of my professional time to the clinical practice of medicine;

"3. I have expertise in standard of care relative to the issue of a primary care physician's treatment of suspected cardiac-related concerns;

"4. I have reviewed numerous records in the instant matter including the deposition transcript of Raisa Lerner, M.D., the deposition transcript of Michael Rocco, M.D. and the deposition transcript of Agnes Burris;

"5. In my opinion, to a reasonable degree of medical certainty, had Dr. Lerner been informed on the evening of February 16, 1995 or the morning of February 17, 1995 of the result of the Thallium Stress Test undergone by Earnest Burris, deceased, on February 16, 1995, then the standard of care would

have required her to make a reasonable effort to contact the patient, inform him of the results, and assess the patient's situation clinically; it is my further opinion to a reasonable degree of medical certainty that had the patient been contacted prior to the fatal event, the standard of care would have required Dr. Lerner to admit the patient based on his symptoms; it is my opinion to a reasonable degree of medical certainty that Mr. Burris would have survived had he been admitted on February 17, 1995, prior to the fatal event."

Dr. Rocco testified that the message he would have left with Dr. Lerner's answering service "would not necessarily [have been] on an emergent basis" and that, as he interpreted the stress test, he did not feel Mr. Burris was in a position of having his life immediately threatened by virtue of his findings. However, on cross-examination by plaintiff's counsel, Dr. Rocco conceded (1) that the documented presence of a significant amount of ischemia does pose a significant risk of sudden death and (2) that if, in conversation with Dr. Lerner, Dr. Rocco had discovered that the patient had increased clinical symptomatology compatible with an unstable coronary state, "that would change things"—under those circumstances, it would have been urgent to see the patient immediately.

Mr. Burris was apparently suffering from increased clinical symptomatology compatible with an unstable coronary state on the evening of February 16, 1995 and prior to his death on February 17, 1995. Mrs. Burris testified on deposition that, both on the day of the stress test and on the day of his death, her husband complained to her about the pain he was experiencing. She testified that after the stress test her husband told her he was hurting "more"—"[h]e was having severe pain in his left shoulder and pain would go all the way down his arm and he felt that it was his heart."

The next day Mrs. Burris came home from work around 3:45 p.m. and found her husband "sitting at the kitchen table and he is not a person that complains * * * a lot; but if he was hurting he would actually tell me if he was hurting. And he was, you know, sitting at the table * * * with his hands kind of rubbing his arm * * *."

Later that evening, after they had gone to pick up their twin daughters from a Singing Angels concert, Mr. Burris, who had pulled the car into the garage, was found collapsed on the garage floor. He was taken to the hospital, where he was pronounced dead at 9:40 p.m. on February 17, 1995.

Following the grant of summary judgment in Dr. Lerner's favor, plaintiff voluntarily dismissed the remaining co-defendants and perfected this appeal.

Plaintiff's sole assignment of error states as follows:

"The trial court erred in granting summary judgment in defendant Raisa Lerner, M.D.'s favor when there existed genuine issues of material fact as to

whether she breached the standard of care in treating plaintiff's decedent, and as to whether that breach was a proximate cause of his death."

■ Appellate review of summary judgments is *de novo. Grafton v. Ohio Edison Co.* (1996), 77 Ohio St.3d 102, 105, 671 N.E.2d 241, 245; *Zemcik v. La Pine Truck Sales & Equip.* (1998), 124 Ohio App.3d 581, 585, 706 N.E.2d 860, 863–864. The Ohio Supreme Court recently restated the appropriate test in *Zivich v. Mentor Soccer Club* (1998), 82 Ohio St.3d 367, 369–370, 696 N.E.2d 201, 203–204, as follows:

"Pursuant to Civ.R. 56, summary judgment is appropriate when (1) there is no genuine issue of material fact, (2) the moving party is entitled to judgment as a matter of law, and (3) reasonable minds can come to but one conclusion and that conclusion is adverse to the nonmoving party, said party being entitled to have the evidence construed most strongly in his favor. *Horton v. Harwick Chem. Corp.* (1995), 73 Ohio St.3d 679, 653 N.E.2d 1196, paragraph three of the syllabus. The party moving for summary judgment bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Dresher v. Burt* (1996), 75 Ohio St.3d 280, 292–293, 662 N.E.2d 264, 273–274."

Once the moving party satisfies its burden, the nonmoving party "may not rest upon the mere allegations or denials of the party's pleadings, but the party's response, by affidavit or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Civ.R. 56(E). *Mootispaw v. Eckstein* (1996), 76 Ohio St.3d 383, 385, 667 N.E.2d 1197, 1199. Doubts must be resolved in favor of the nonmoving party. *Murphy v. Reynoldsburg* (1992), 65 Ohio St.3d 356, 358–359, 604 N.E.2d 138, 139–140.

Here, Dr. Lerner's motion for summary judgment did not offer an affidavit from an expert witness to demonstrate that her care of this patient was consistent with the appropriate standard of care. Rather, Dr. Lerner's motion and supporting papers undertook to attack plaintiff's expert report on the grounds that the evidence of record showed an absence of sufficient underlying facts to trigger the standard of care as set forth in the report of Dr. Garrett, plaintiff's expert.

Dr. Garrett averred, to a reasonable degree of medical certainty, that had Dr. Lerner been informed of Mr. Burris's stress test results on the evening of February 16, 1995, or the morning of February 17, 1995, the standard of care would have required her to make a reasonable effort to contact the patient, inform him of the results, and assess his situation clinically; and that had she done so, the standard of care would have required Dr. Lerner to admit the patient based on his continuing symptoms. Dr. Garrett also averred that had

Mr. Burris been admitted on February 17, 1995, prior to the fatal event, he would have survived. Dr. Garrett's affidavit thus provides evidence of the standard of care that was required and the failure to observe it, which he avers led to Burris's death.

■ Dr. Lerner's summary judgment motion papers did not challenge the duty of care or proximate cause opinion of Dr. Garrett. Instead, Dr. Lerner contended that the facts showed indisputably that (1) prior to Mr. Burris's death, she never received a call from Dr. Rocco indicating that Mr. Burris's test results were abnormal and (2) even if she had received such a call from Dr. Rocco, Dr. Rocco would have told her there was no need to see the patient immediately— hence, she would not have been negligent in not contacting Mr. Burris prior to his death. We find on this state of the record that there are disputed issues of material fact which precluded a grant of summary judgment for defendant.

The evidence as to whether Dr. Lerner was notified of Mr. Burris's abnormal stress test results either the evening of February 16, 1995, or the morning of February 17, 1995, is, of course, the critical factual issue in the case.

Dr. Lerner testified that Dr. Rocco never called her with Mr. Burris's test results prior to Burris's death. Conversely, Dr. Rocco testified that, with test results such as existed in this case, it would have been his custom and practice to have notified Dr. Lerner of the results on the evening of February 16, and that, if she had not been available, he would have left a message for her to call him. Dr. Lerner admitted that if Dr. Rocco had left a message with her answering service—even if he had not identified it as "urgent"—she would have received his message sometime on the morning of February 17, between 8:30 and 9:00 a.m., and that she would have called him back.

The legal question presented by this state of the evidence is whether Dr. Rocco's testimony as to his custom and practice may suffice to controvert Dr. Lerner's testimony that she received no such call. Under the law of Ohio, we find that it may.

## Evid.R. 406. HABIT; ROUTINE PRACTICE

"Evidence of the habit of a person or of the routine practice of an organization, whether corroborated or not and regardless of the presence of eyewitnesses, is relevant to prove that the conduct of the person or organization on a particular occasion was in conformity with the habit or routine practice."

Evid.R. 406 has been applied in both business and medical contexts to establish that the witness's routine practice was adhered to in the situation before the court as to which the witness has no particular recollection.

In *Mulford–Jacobs v. Good Samaritan Hosp.* (Nov. 20, 1996), Hamilton App. No. C–950634, unreported, 1996 WL 667833, the plaintiff sued the defendant hospital for negligence in the plaintiff's prenatal care, which allegedly resulted in the plaintiff's delivery of a stillborn fetus. The plaintiff alleged that the stillborn birth was due to the resident physician's negligence in failing to provide plaintiff an antibiotic to treat a urinary tract infection ("UTI"). To refute this contention, the hospital offered testimony from its resident, Dr. Rohe, who treated the plaintiff once during the time period in question and who reviewed the plaintiff's lab reports indicating the presence of a UTI. Dr. Rohe testified that, although he had no independent recollection of the plaintiff's case, his habit in such situations was to prescribe an antibiotic. Dr. Rohe further testified "that the patient would be notified of the infection and prescription, and he [Dr. Rohe] would either call the pharmacy directly or leave the prescription with the nursing staff for the patient to obtain." *Id.* at 1. Dr. Rohe also testified that his behavior in the plaintiff's case "would have conformed with his behavior in all similar cases: *i.e.*, he would have prescribed an antibiotic for the infection." *Id.*

Although the plaintiff herself testified that she never received a prescription at the time in question, the trial court found that Dr. Rohe's testimony was admissible to contradict the plaintiff's testimony, and sufficient to support the verdict for the defendant. In affirming this ruling, the court of appeals noted that "[w]hether Dr. Rohe's habitual response in fact occurred in this case * * * [was] a question of weight and credibility for the trier of fact." *Id.* at 2. See, also, *Rae v. Geier* (Sept. 20, 1996), Darke App. No. 1393, unreported, 1996 WL 531591 (trier of fact has the discretion to determine what weight it will give to "habit" testimony).

In *Brokamp v. Mercy Hosp. Anderson* (1999), 132 Ohio App.3d 850, 726 N.E.2d 594, testimony as to the routine practice of a nurse, who had no recollection of the particular instance in question, was deemed admissible to refute the plaintiff's assertion of fact. In *Brokamp*, the plaintiff sued the hospital in which he had disc surgery for nerve damage which he allegedly sustained as a result of an improperly administered injection of Demerol. Although it was undisputed that the injection was administered, there was a material dispute of fact as to the precise anatomical location of the injection, which the medical records did not address. Nurse Barringer, who administered the injection, had no recollection of the events in question, but was permitted to testify as to his normal practice to establish what he would have done in this case. On appeal from a verdict in the defendant's favor, the appeals court rejected the plaintiff's contention that this evidence was improperly admitted. The appeals court stated:

■ "To lay the proper foundation, the proponent of the evidence must show that routine in fact exists and that the stimulus for the habitual response occurred on the particular occasion.

"The proper foundation was laid that [Nurse] Barringer normally gave a shot in the outer quadrant of the buttocks, or, when a patient could not be turned to his side, in the middle portion of the thigh. And [Nurse] Barringer stated that there was nothing in the medical record to support the inference that he did not act pursuant to his normal custom on August 30, 1993. Accordingly, we hold that the proper foundation was laid to admit [Nurse] Barringer's testimony relating to his routine, and we, therefore, overrule the assignment as it relates to him." *Id.* at 865, 726 N.E.2d at 605.

Numerous other cases, in Ohio and elsewhere, support the conclusion that routine practices undertaken by one in the context of medical or business situations are precisely the sorts of scenarios for which the foregoing rule of evidence was intended. See, e.g., *M.E. Wickes Agency, Inc. v. Gen. Ins. Agency of Columbus* (Aug. 6, 1981), Franklin App. No. 81AP–68, unreported, 1981 WL 3388 (admitting evidence of habit and routine practice to explain notations made on file by insurance company's employee); *In re Swine Flu Immunization Products Liab. Litigation* (D.Colo.1980), 533 F.Supp. 567 (admitting evidence of county health department's habit and routine practice of obtaining signed consent forms prior to administering vaccine to establish that plaintiff received information concerning adverse effects of vaccine); *Meyer v. United States* (D.Colo.1979), 464 F.Supp. 317 (admitting evidence of dentist's regular and routine practice of warning patients of risks involved in oral surgery as persuasive on the issue of whether he provided such warning to patient, even though patient unequivocally testified that she received no such warning); *Bloskas v. Murray* (Colo.1982), 646 P.2d 907 (admitting testimony of defendant doctor that, prior to performing joint replacement surgery, he routinely advised patients of the risks of infection and of the loosening of implanted devices).

In the instant case, Dr. Rocco's testimony as to his customary practice of phoning the referring physician the same evening that he determined the stress test results to be abnormal is likewise admissible to contradict Dr. Lerner's testimony that she never received such a call. The credibility issue inherent in the conflict of testimony is for the finder of fact to resolve.

Dr. Rocco testified that the test results in question were abnormal; that his custom and practice when he received such test results was to phone the referring physician that very evening; that, had he not been able to reach the physician that night, he would have left a message with her answering service asking that she call him; and that he would have followed this custom and practice in the instant case. Thus, as in the cases discussed above, Dr. Rocco's testimony is admissible on this issue, leaving the trier of fact to determine which of the two doctors to believe.

■ The only other issue raised by Dr. Lerner's motion for summary judgment was whether the message which Dr. Rocco would have communicated to Dr. Lerner (assuming that such a call was made) would have been of a nature to have triggered a duty on Dr. Lerner's part to call the patient, assess his situation clinically, and admit him to the hospital on February 17, 1995.

The affidavit of plaintiff's expert witness, Dr. Garrett, provided the standard of care to be met. Dr. Garrett's affidavit states that if Dr. Lerner had received the test results from Dr. Rocco, the standard of care would have required her to call the patient, inform him of the results, assess his situation clinically, and admit him to the hospital.

■ The affidavit of Dr. Garrett suffices to raise an issue on whether Dr. Lerner's conduct violated the standard of care, assuming that the trier of fact concludes that she did receive Dr. Rocco's call. In this respect, it is well settled that an affidavit by an expert witness may suffice to defeat a motion for summary judgment. *See, e.g., Syler v. Signode Corp.* (1992), 76 Ohio App.3d 250, 257, 601 N.E.2d 225, 230; *Hays v. St. Elizabeth Hosp. Med. Ctr.* (Oct. 20, 1997), Mahoning App. No. 86C.A.121, unreported, 1987 WL 18845; *Cyrus v. Henes* (Dec. 26, 1991), Lorain App. No. 91CA005074, unreported, 1991 WL 284190. Thus, a genuine issue of material fact has been created by the affidavit of Dr. Garrett indicating that the standard of care required the follow-up and hospitalization to have occurred on February 16 or on February 17 before Mr. Burris's death that night. Thus, even if Dr. Lerner offers evidence from which reasonable minds could disagree with Dr. Garrett's opinion, there is still a bona fide factual dispute which must be resolved by the trier of fact.

Dr. Lerner, however, contends that, had Dr. Rocco called her, he would have recommended that the patient be further evaluated within a few days, as there was no urgency, and that, as fate would have it, Mr. Burris passed away before the follow-up was required to occur. We are not persuaded by this argument given the strict standards of summary judgment.

Dr. Rocco stated that the message he would have left with Dr. Lerner's answering service "would not necessarily [have been] on an emergent basis" and that, as he interpreted Mr. Burris's stress test, he did not feel that Mr. Burris was in a position of having his life immediately threatened by virtue of his findings. These few lines of testimony are not dispositive, however. Dr. Rocco also acknowledged that he felt that Mr. Burris's test results were abnormal and warranted further evaluation and that the ultimate determination as to how to proceed when this information was communicated to the referring physician would depend upon a clinical assessment of the patient's symptoms. Dr. Rocco also testified that if he did speak with Dr. Lerner, and she got in touch with the patient that evening or the next morning, and the patient communicated to her

that he was having left arm pain or chest pain, "I think immediate evaluation at that time would be reasonable."

In contrast to his earlier statement of nonemergency, Dr. Rocco also conceded that the documented presence of a significant amount of ischemia does pose a risk of sudden death.

Dr. Rocco himself concluded that Mr. Burris's thallium scans suggested either cardiomyopathy or potentially ischemia. He also did not "qualitatively" disagree with the neuroradiologist's interpretation of those scans that found them to be "consistent with multi-vessel coronary artery disease with * * * a large amount of reversible myocardial ischemia." Further, he stated that, if, in conversation with Dr. Lerner, Dr. Rocco had discovered that Mr. Burris had increased clinical symptomatology compatible with an unstable coronary state, "that would change things"—under those circumstances, it would have been urgent to see the patient immediately.

There is evidence proffered by Mrs. Burris that her husband was suffering from increased clinical symptomatology compatible with an unstable coronary state because after the stress test (both on the day of the test and the next day), her husband was hurting "more" and that he was "having severe pain in his left shoulder and pain that would go all the way down his arm and he felt that it was his heart." Had Dr. Lerner called Mr. Burris and discovered these facts, it would have been incumbent upon her to do a clinical assessment—a fact which Dr. Lerner admits—which would then have triggered the need to admit him to the hospital on an emergency basis.

Under these circumstances, we find error in the grant of summary judgment for the defendant; there are disputed issues of material fact which should be resolved by the trier of fact.

Appellant's sole assignment of error is sustained.

*Judgment reversed*
*and cause remanded.*

DYKE, A.J., and ROCCO, J., concur.