**Georgia THOMAS (as Executrix of the Estate of Lena M. Rhodes, Deceased), Appellant/Cross–Appellee**

v.

**GREENVIEW HOSPITAL, INC. (d/b/a Greenview Regional Hospital), Appellee/Cross–Appellant.**

**Nos. 2002–CA–001223–MR, 2002–CA–001272–MR.**

Court of Appeals of Kentucky.

Feb. 6, 2004.

---

D. Brian Rattliff, Louisville, KY, for appellant/cross-appellee.

John R. Grise, Scott D. Laufenberg, Bowling Green, KY, for appellee/cross-appellant.

Before BUCKINGHAM, COMBS, and TACKETT, Judges.

## OPINION

TACKETT, Judge.

Georgia Thomas, acting as executrix of the estate of Lena M. Rhodes, has brought a direct appeal from the judgment of the Warren Circuit Court following a jury verdict, which awarded her $62,000.00 in medical expenses and punitive damages on a claim of medical negligence against Greenview Hospital, Inc., d/b/a Greenview Regional Hospital. Thomas contends the trial court erred in refusing to grant a new trial based on the admission of alleged improper "habit" evidence and the jury's failure to award any damages for pain and suffering. On the other hand, Greenview Hospital has cross-appealed challenging the sufficiency of the evidence for submission of the punitive damages instruction to the jury, the admission of evidence on the identity of the owner of the hospital, the qualification of Thomas's nursing expert to provide opinion testimony on the treatment of Lena Rhodes's wound condition, and the trial court's failure to limit the evidence on medical expenses to those actually paid to Greenview, rather than the total amount billed. After reviewing the record and the applicable law, we affirm.

In early July 1999, Georgia Thomas's mother, Lena Rhodes, who had been living with Thomas, experienced shortness of breath and anxiety while undergoing kidney dialysis and was admitted to T.J. Samson Community Hospital suffering from pulmonary edema.[1] At that time, Rhodes suffered from numerous medical problems including diabetes, diabetic retinopathy, neuropathy, peripheral vascular disease, hypertension, hyper-glycemia, end stage renal disease, and anemia secondary to renal insufficiency. She required periodic hemodialysis and had had her right leg amputated below the knee. On July 6, 1999, Rhodes was transferred from T.J. Samson Hospital to the acute care unit at Greenview Hospital because the dialysis that she needed was unavailable at T.J. Samson. At Greenview, Rhodes was diagnosed with congestive heart failure secondary to non-compliance with dialysis, hypertension, renal disease, and diabetes. After exhibiting signs of improvement, on July 10, 1999, she was transferred to the transitional care unit (TCU) at Greenview by Dr. Scott Sims, a nephrologist, where she was monitored and received physical therapy and dialysis on an outpatient basis.

On July 12, 1999, Rhodes returned to Greenview's TCU from an off-site kidney dialysis center. She exhibited confusion, stating that she believed she was in her daughter-in-law's house, refused to go to bed, and later was found in another patient's room. In order to allow greater observation, Rhodes was placed in a chair unrestrained next to the nurses' station, but she fell when she rose from the chair and attempted to walk away. Rhodes complained of hip pain upon returning to her room and an x-ray revealed that she had fractured her right hip. On July 13, 1999, Dr. Keith Morrison performed a right hip hemiarthroplasty and Rhodes

---

1. Pulmonary edema is the buildup of fluid in the lungs, usually resulting from the heart's inability to pump blood effectively through the body. One cause of pulmonary edema is kidney failure.

was placed in the acute care unit. Rhodes tolerated the surgery well but required continued dialysis, so she was transferred back to the TCU on July 21.

Upon her return to the TCU, Rhodes was considered "at risk" for development of bedsores given her poor nutritional status, lack of mobility, and various medical problems. Dr. Sims ordered that she be turned every two hours and as needed, which was consistent with Greenview's own policies and procedures. Drs. Sims and Morrison examined Rhodes upon her readmission to the TCU. A Braden Scale skin risk assessment was conducted for evaluation of appropriate precautions for potential development of pressure ulcers, often referred to as bedsores.

On July 22, 1999, examination by the nursing staff noted erythema (redness) of the coccyx (tailbone). In response to a request by the family, Dr. Sims ordered an airbed mattress, application of a special cream, and placement of a DuoDERM dressing on the coccygeal area. Over the next few days, the skin in the coccygeal area continued to deteriorate, so Bonnie Spears, a registered nurse in the hospital's wound care center, was consulted on July 26, 1999, about the developing ulcer wound. She noted a 30 millimeter by 20 millimeter eschar (scab) with a black center and yellow area suggestive of heavy fibrin and pink granulation tissue at the outer edge. Nurse Spears recommended evaluation by Dr. Timothy Hulsey, a plastic surgeon specializing in wound treatment. Dr. Hulsey noted that Rhodes was anemic and malnourished. He identified a sacral decubitus ulcer or wound approximately 4 centimeters in diameter that appeared to be superficial with a dry eschar. Dr. Hulsey ordered application of a Betadine solution on the sacral wound.

On August 3, 1999, a nurse noted that the sacral decubitus appeared to have worsened to a stage 2 level with black eschar present with an open red area and fluid drainage. The nursing staff allegedly sent a message to the wound care center requesting additional consultation, but Nurse Spears did not see Rhodes again until August 6, 1999. Nurse Spears and Dr. Sims both examined Rhodes. Dr. Sims noted that the decubitus looked bad, but he ordered continuation of the current treatment.

On August 7, 1999, a nurse noted a foul odor and greenish-red drainage from the wound while changing the sacral bandage. Rhodes also was weak and not tolerating her physical therapy well. After discussing Rhodes's deteriorating condition with her family, they decided not to utilize a feeding tube. On August 10, 1999, the family consented to cessation of Rhodes's dialysis treatment. Dr. Sims also ordered a culture of the decubitus and cleansing of the area with antiseptics.

On August 11, 1999, Rhodes was transferred to T.J. Samson Hospital in large part to be closer to her family given the belief that her overall condition was terminal. The sacral decubitus was noted to be at the stage 3 level measuring approximately 17 centimeters by 15 centimeters with a very foul odor. On August 12, 1999, Rhodes died with the cause of death being diagnosed at that time as chronic renal failure.

On July 12, 2000, Thomas filed a civil complaint for negligence by the agents and employees of Greenview Hospital. She requested compensatory and punitive damages. Discovery by the parties included extensive interrogatories, production of documents, and numerous depositions. On February 15, 2002, Greenview filed mo-

tions in limine [2] to prohibit any reference to its parent corporation, Columbia HCA Healthcare, and to limit Thomas's proof on medical expenses to the actual amounts incurred by the estate, rather than the total amounts initially charged and not subject to payment to the hospital because of agreements with healthcare payors such as the federal government through the Medicare program. On February 18, 2002, Greenview filed a motion in limine to limit or exclude the testimony of one of Thomas's proposed expert witnesses, Holly Strader, a registered nurse, under Kentucky Rules of Evidence (KRE) 702. On February 19, 2002, Thomas filed a motion in limine to preclude "habit" testimony concerning whether the nurses had turned Rhodes off her back every two hours to relieve pressure on her sacral area.

On February 28, 2002, the trial court held a hearing on the various motions. On March 6, 2002, the court entered a written order denying Thomas's motion to preclude testimony by the nurses on their routine in rotating or turning Rhodes and denying Greenview's motion to exclude testimony by Holly Strader as an expert witness. The trial court orally granted Greenview's motion on references to Columbia HCA Healthcare except for purposes of inquiries during voir dire and denied Greenview's motion to limit evidence of medical expenses to the amount requested for payment, but the court stated it would entertain a motion from Greenview after the trial to reduce any medical expense awarded by the jury to the amount actually paid or payable to the hospital for purposes of the judgment.

The trial court conducted a jury trial lasting six days between March 13–15, 26–28, 2002. During the trial, Thomas alleged that Rhodes's injury from the fractured hip and the development of the pressure ulcer was a direct result of the negligence of the nursing staff at Greenview. Thomas maintained that the nursing staff breached its standard of care by failing to provide proper supervision to prevent Rhodes's fall, failing to properly assess the potential for the pressure ulcer and take appropriate actions to prevent its development, especially turning or rotating Rhodes at required intervals, failing to obtain appropriate treatment orders, and failing to take the necessary interventions to prevent the ulcer from developing further and becoming worse. Thomas alleged the negligent care resulted in pain and suffering, and ultimately Rhodes's death. Greenview presented testimony that the nursing staff acted properly, and that the development of the pressure ulcer was inevitable because of her various medical problems, declining medical condition, and the failure of several internal systems. Greenview moved for a directed verdict and exclusion of an instruction on the claim for punitive damages because of the lack of evidence, which the trial court denied. The jury returned a verdict finding Greenview negligent and awarded the estate $30,814.03 for medical expenses covering the period between July 10–August 11, 1999, and $31,185.97 in punitive damages, but awarded $0 for mental and physical pain and suffering and $0 for burial expenses.

On April 8, 2002, the trial court entered a judgment for Thomas for $62,000, consistent with the jury's verdict. On April 12, 2002, Greenview filed a motion to alter or amend the judgment seeking a reduction of the amount for medical expenses to $13,962.35 based on the actual amount owed by or paid on behalf of the estate after adjustments to the charges under the Medicare program. At the same time,

---

**2.** *See* Kentucky Rules of Evidence 103(d).

Greenview filed a motion to vacate the award for punitive damages. On April 18, 2002, Thomas filed a combined response to Greenview's motions and motion for a new trial under Kentucky Rules of Civil Procedure (CR) 59.01 on grounds of an inconsistent and inadequate verdict on damages, misconduct by Greenview's attorneys, and the admission of improper "habit" evidence.

On April 22, 2002, the trial court conducted a hearing on the post-judgment motions. On May 9, 2002, the court entered an order denying Thomas's motion for a new trial, denying Greenview's motion to vacate the punitive damages award, and granting Greenview's motion to reduce the medical expenses award. This appeal and cross-appeal followed.

■ On appeal, Thomas raises two issues involving the admission of evidence of routine conduct and the failure to award damages for pain and suffering. Thomas maintains that the trial court erred by admitting testimony from several nurses that as part of their regular safety rounds, they would turn or reposition patients. She contends that this testimony constituted "habit" evidence that is inadmissible under Kentucky common law. On the other hand, Greenview contends that the challenged testimony was admissible evidence of "custom." The admissibility of routine conduct implicates several evidentiary rules such as KRE 401 and 402, which permit the admission of relevant evidence, and KRE 403, which excludes otherwise relevant evidence if its probative value is substantially outweighed by its prejudicial effect. While the decision whether to admit specific evidence under these rules generally falls within the abuse of discretion standard review, *see, e.g., Green River Elec. Corp. v. Nantz,* Ky.App., 894 S.W.2d 643, 645 (1995); *Commonwealth v. English,* Ky., 993 S.W.2d 941, 945 (1999), the question of the scope of the Kentucky rule involving whether the evidence is the type of evidence subject to exclusion under the rule is a legal issue reviewed *de novo.*

It is undisputed that historically, Kentucky case law has prohibited the use of "habit" evidence to prove conformity with that conduct on a particular occasion. *See* Robert G. Lawson, *The Kentucky Evidence Law Handbook,* § 2.35 (4th ed.2003); *Cincinnati, N.O. & T.P. Ry. Co. v. Hare's Adm'x,* 297 Ky. 5, 178 S.W.2d 835 (1944), *overruled on other grounds, Louisville & N.R. Co. v. Fisher,* Ky., 357 S.W.2d 683 (1962). In reliance on the discussion in Professor Robert Lawson's treatise *The Kentucky Evidence Law Handbook,* Greenview asserts that evidence of "custom" represents an exception to the general exclusionary rule based on "habit" evidence. "Habit" is generally defined as an individual person's specific regular or consistent response to a repeated situation. *See, e.g.,* Lawson, *The Kentucky Evidence Law Handbook,* § 2.35[1], at 173; 29 Am.Jur.2d *Evidence* § 392 (1994); *People v. Memro,* 38 Cal.3d 658, 681, 700 P.2d 446, 462, 214 Cal.Rptr. 832, 848 (1985). "Custom" is defined as the routine practice or behavior on the part of a group or organization that is equivalent to the habit of an individual. *Memro, supra;* 29 Am. Jur.2d *Evidence* § 394.[3] *But see Palinkas v. Bennett,* 416 Mass. 273, 620 N.E.2d 775, 777 (1993)(stating a business habit can involve a single person). Several nurses

---

**3.** The trial court cited to the American Law Institute's Model Code of Evidence Rule 307(1) (1942), which states: "Habit means a course of behavior of a person regularly repeated in like circumstances. Custom means a course of behavior of a group of persons regularly repeated in like circumstances." *But see* 23 Charles Alan Wright & Kenneth W. Graham, Jr., *Federal Practice and Procedure* § 5274 (1980).

testified that the turning of patients at risk for pressure sores was a standard procedure performed as part of their safety rounds. We agree with Greenview that this repeated conduct by the entire nursing staff at the hospital more closely resembles a "custom" or business routine involving numerous persons acting as an entity even though any act of turning on a specific occasion might typically be performed by a single individual. The more expansive aspect of the conduct outside of a single person separates it from "habit."

The Kentucky exclusionary approach to evidence on routine conduct is an extreme minority position. Nevertheless, the Kentucky Supreme Court recently reaffirmed that position in *Burchett v. Commonwealth,* Ky., 98 S.W.3d 492 (2003), which included three opinions. Even though a majority of the justices favor joining the vast majority of other states and federal courts in admitting evidence of routine behavior, the plurality opinion adhering to the prior exclusionary approach noted the court's rejection in 1990 of the proposed KRE 406, which modeled the Federal Rules of Evidence (FRE) 406. *Id.* at 495.[4] For purposes of our discussion, it is important to note that FRE 406 permits admission of evidence of both "habit of a person *or of the routine practice of an organization* ... [as relevant] to prove that the conduct of the person *or organization* on a particular occasion was in conformity with the habit *or routine* practice." (Emphasis added).[5] In his thorough analysis of the issue, Justice Cooper in his dissenting opinion stated that other than Kentucky, only Massachusetts precludes evidence of habit to prove conforming conduct, but it alone distinguishes personal habit and business habit or customs, allowing admission of the latter but not the former. *Id.* at 507–08. Summarizing his review of the current state of the law, Justice Cooper said, "Thus, Kentucky is the only jurisdiction that precludes, under all circumstances, admission of evidence of individual habit *or of the routine practice of an organization* as circumstantial evidence of conforming conduct on a specific occasion." *Id.* at 508.[6]

■ We agree with Justice Cooper's evaluation of Kentucky law in that it excludes both personal habit and custom or business routine practice in proving conforming conduct. Greenview's reliance on Professor Lawson's treatise discussion in asserting that custom evidence is an exception to the exclusionary bar on routine behavior is misplaced. A review of Professor Lawson's discussion and the cases cited therein reveal that those cases authorized the admission of custom evidence that was relevant for purposes *other than* to prove conforming conduct on a specific occasion, such as to show apparent authority of a manager,[7] to prove fault,[8] to show notice,[9] and to establish the standard of

---

4. Justice Keller in a concurring opinion expressed agreement with the dissenter's desire to adopt a Kentucky counterpart to FRE 406 but stated such a change in Kentucky law should be by amendment of the rules of evidence pursuant to KRE 1102, rather than by case law.

5. *See also* Uniform Rules of Evidence (URE) 406(a); John P. Ludington, Annotation, *Habit or routine practice evidence under Uniform Evidence Rule 406,* 64 A.L.R.4th 567 (1988).

6. Routine practice of an organization under FRE 406 was intended to include "custom" under common law.

7. *R.H. Kyle Furniture Co. v. Russell Dry Goods Co.,* Ky., 340 S.W.2d 220 (1960).

8. *Mahan v. Doggett,* 27 Ky.L.Rptr. 103, 84 S.W. 525 (1905).

9. *Cincinnati, N.O. & Texas Pac. R. Co. v. Zeder,* Ky., 328 S.W.2d 525 (1959).

care.[10] Therefore, evidence that the nurses at Greenview routinely turned patients as a part of their safety rounds was not admissible to prove that they acted in conformity with this custom on particular occasions with respect to Rhodes.[11]

■ Even though the exclusion for "habit" evidence would include "custom" or business routine under Kentucky law, we do not believe that Thomas is entitled to a new trial based on application of this rule in this case. First, Thomas cannot complain about the admission of the evidence on the nurses' repositioning routine because she initiated introduction of this evidence. In her case-in-chief, Thomas focused exhaustively on the hospital's medical records as evidence that the nursing staff failed to provide adequate care. In the direct examination of the nurses, Thomas's counsel had the attending nurses highlight each of several specific entries they made in the medical records indicating that Rhodes was turned. Counsel then asked each if there were any other entries or documents indicating that Rhodes had been turned. The nurses each then referred to the entries stating safety rounds were performed every two hours, which they said routinely included turning the patient. Through additional questioning from Thomas's attorney, these witnesses admitted that they were aware that Dr. Sims had ordered Rhodes be repositioned every two hours but that they did not record an entry every two hours in the medical chart stating explicitly that they had turned Rhodes. " 'One who asks questions which call for an answer has

waived any objection to the answer if it is responsive.' " *Mills v. Commonwealth,* Ky., 996 S.W.2d 473, 485 (1999) (quoting *Estep v. Commonwealth,* Ky., 663 S.W.2d 213, 216 (1983)); *Hodge v. Commonwealth,* Ky., 17 S.W.3d 824, 845 (2000). By specifically asking these witnesses to identify indications in the medical records showing that they had turned Rhodes, Thomas cannot object to their responsive answers.

■ On cross-examination, Greenview had the nursing witnesses further explain the safety rounds entries in the records and their routine of turning patients during these rounds. Under the concept known as "opening the door" or "curative admissibility," Greenview's further questioning of the nurse witnesses on their routine conduct of turning patients in performing safety rounds was admissible and the fact that they did not believe that they had to record their turning activity when recording an entry for safety rounds was evidence to rebut Thomas's earlier questioning on the charting requirements. *See generally* Lawson, *The Kentucky Evidence Law Handbook,* § 1.10[5] (discussing open door concept). A party who first introduces either irrelevant or incompetent evidence into the trial cannot complain of the subsequent admission of similar evidence from the adverse party relating to the same subject matter. *Commonwealth v. Alexander,* Ky., 5 S.W.3d 104, 105 (1999) (quoting *Dunaway v. Commonwealth,* 239 Ky. 166, 39 S.W.2d 242, 243 (1931)); *Smith v. Commonwealth,* Ky., 904 S.W.2d 220, 222 (1995). In effect, the evidence of routine behavior in safety rounds became rel-

---

**10.** *Baker v. Hancock,* Ky.App., 772 S.W.2d 638 (1989).

**11.** We note that routine practices in the context of medical situations have been recognized as falling within URE 406. *See, e.g., Hoffart v. Hodge,* 9 Neb.App. 161, 609 N.W.2d 397 (2000); *Brandt v. Engle,* 791 So.2d 614

(La.2001); *Burris v. Lerner,* 139 Ohio App.3d 664, 745 N.E.2d 466 (2000); *Brokamp v. Mercy Hosp. Anderson,* 132 Ohio App.3d 850, 726 N.E.2d 594 (1999). *But see Ligon v. Southside Cardiology Associates, P.C.,* 258 Va. 306, 519 S.E.2d 361 (1999)(barring evidence of general routine behavior of organization).

evant and admissible for a purpose other than to show conformity on a particular occasion, that being to explain the entries for safety rounds and the lack of explicit entries referring to repositioning of Rhodes. The fact that evidence may be inadmissible to prove one proposition does not preclude its introduction to prove another proposition. Lawson, *The Kentucky Evidence Law Handbook*, § 1.05[2], at 24–25.

■ Thomas's second issue involves a complaint that she was entitled to a new trial because the award of $0 for pain and suffering was inadequate as a matter of law. *See* CR 59.01(d). Both parties properly cite to *Miller v. Swift*, Ky., 42 S.W.3d 599 (2001), where the Kentucky Supreme Court held that a jury is not required to award damages for pain and suffering whenever it awards medical expenses. The court indicated that such a verdict is not inconsistent and is not automatically inadequate as a matter of law. *Id.* at 602. The question of inadequacy of damages depends on the nature of the underlying evidence and whether the jury's verdict is supported by probative evidence. *Id.* at 601–02. Moreover, a trial court's decision on whether to grant a new trial based on inadequate damages should be upheld unless it is clearly erroneous. *Id.* at 601. In addition, in *Burgess v. Taylor*, Ky.App., 44 S.W.3d 806, 813 (2001), this court explained that the trial court initially exercises its discretion to determine if the jury's damage award was given under the influence of passion or prejudice or in disregard of the evidence, and the appellate court only reviews whether the trial court abused its discretion. *See also McVey v. Berman*, Ky.App., 836 S.W.2d 445, 448 (1992).

■ The majority of evidence on the issue of damages for pain and suffering centered on the effect of the pressure ulcer. Thomas concedes that the evidence on the extent of pain Rhodes actually experienced because of the pressure ulcer was conflicting. Greenview's physician experts testified that Rhodes's diabetic condition would have diminished her sensitivity to pain; whereas, Thomas's nursing expert opined that Rhodes probably would have experienced pain given the size and severity of the pressure ulcer. Dr. Sims noted that Rhodes's tendency to turn onto her back supported his opinion that she was not cognizant of pain from the pressure ulcer.

Thomas asserts that in addition to the pressure ulcer, Rhodes obviously suffered pain from the hip injury and resulting hip surgery. However, she points to only two references in the medical records for July 12 and 13, 1999, that Rhodes expressed some pain in her hip.[12] The record for these days also states that Rhodes declined any pain medication at that time. In fact, the medical records and testimony of the nursing witnesses indicate that Rhodes received very little pain medication throughout her stay at Greenview. Additionally, Georgia Thomas testified that Rhodes never complained of pain to her hip or appeared to be in pain because of her fall and the surgery.

Based on a review of the evidence as a whole, Thomas has not shown that the trial court abused its discretion by deciding the jury did not act under the influence of passion or prejudice or in disregard of the evidence in awarding $0 damages for pain and suffering. The expert evidence on Rhodes's lack of ability to sense pain, her general state of mental confusion, and the paucity of evidence that she expressed pain or required pain medication, all sup-

12. Thomas fails to cite testimony of any witness on this issue.

port the jury's verdict and the trial court's decision. Consequently, we cannot say the trial court's denial of a new trial on the issue of damages for pain and suffering was clearly erroneous.

 On cross-appeal, Greenview challenges the submission of the punitive damages instruction to the jury. It maintains that there was insufficient evidence to support giving such an instruction. An instruction on punitive damages is warranted if there is evidence that the defendant acted with oppression, fraud, malice, or was grossly negligent by acting with wanton or reckless disregard for the lives, safety or property of others. *See Phelps v. Louisville Water Co.,* Ky., 103 S.W.3d 46, 51–52 (2003)(reaffirming definition of gross negligence); *Northeast Health Management, Inc. v. Cotton,* Ky.App., 56 S.W.3d 440 (2001); KRS 411.184. A party is entitled to have the jury instructed on the issue of punitive damages "if there was *any evidence* to support an award of punitive damages." (Emphasis in original). *Shortridge v. Rice,* Ky.App., 929 S.W.2d 194, 197 (1996). With respect to a directed verdict motion in a civil action, all reasonable inferences should be drawn in favor of the non-movant. *Sand Hill Energy, Inc. v. Ford Motor Co.,* Ky., 83 S.W.3d 483, 490 (2002)(quoting *Lewis v. Bledsoe Surface Mining Co.,* Ky., 798 S.W.2d 459, 461 (1990)). All evidence favoring the non-movant must be taken as true and the reviewing court should not attempt to determine the credibility of the witnesses or the weight accorded the evidence. *Id.; Gorman v. Hunt,* Ky., 19 S.W.3d 662, 671 (2000). A reviewing court should not disturb a trial court's denial of a directed verdict motion unless it is convinced that the verdict is palpably or flagrantly against the evidence and was reached as a result of passion or prejudice. *Sand Hill Energy, Inc., supra,* at 490 (quoting *NCAA v. Hornung,* Ky., 754 S.W.2d 855, 860 (1988)); *Inn–Group Management Services, Inc. v. Greer,* Ky.App., 71 S.W.3d 125, 127 (2002).

 The trial court's punitive damages jury instruction included only the element of gross negligence involving wanton or reckless disregard for the life, safety or property of others. Greenview's argument merely reiterates the evidence it presented at trial, but the jury was not compelled to accept Greenview's version of the facts and was free to question the credibility of the witnesses and make inferences from the facts. *See, e.g., Shortridge, supra; Phelps, supra.* For instance, Greenview's witnesses agreed that Rhodes should have been turned every two hours and the jury was not required to accept the nurses' testimony that the turning was done as part of the safety rounds, especially given the ambiguity in the medical records. Furthermore, the air mattress was not provided until two days after it was ordered; a discrepancy between hospital policies and the computer information relied on by the nurses with respect to the Braden Skin Assessment resulted in a delay in examination of Rhodes by the wound care nurse and Dr. Hulsey; the Braden Skin Assessment was erroneously performed; and the wound care nurse failed to properly follow-up and respond to requests for a consultation. We believe there was sufficient evidence to deny the motion for directed verdict and to submit the issue of punitive damages to the jury.

Greenview also contends the trial court erred in allowing Nurse Holly Strader to testify as an expert on the hospital's care with respect to the pressure ulcer.[13] KRE

13. Nurse Strader also offered opinions on the standard of care and breach of duty by the nursing staff related to Rhodes's fall and hip fracture. Greenview's argument does not dis-

702, which governs testimony by expert witnesses, provides that a witness qualified as an expert by knowledge, skill, experience, training, or education may provide opinion testimony if scientific, technical, or specialized knowledge will assist the trier of fact. Greenview complains that Nurse Strader was not qualified to provide expert opinion testimony about the pressure ulcer. A trial court's determination as to whether a witness is qualified to give expert testimony under KRE 702 is subject to an abuse of discretion standard of review. *See Farmland Mut. Ins. Co. v. Johnson,* Ky., 36 S.W.3d 368, 378 (2000); *Fugate v. Commonwealth,* Ky., 993 S.W.2d 931, 935 (1999); *Murphy by Murphy v. Montgomery Elevator Co.,* Ky.App., 957 S.W.2d 297, 299 (1997). "An abuse of discretion occurs when a 'trial judge's decision [is] arbitrary, unreasonable, unfair, or unsupported by sound legal principles.'" *Farmland Mut. Ins. Co.,* 36 S.W.3d at 378 (quoting *Goodyear Tire and Rubber Co. v. Thompson,* Ky., 11 S.W.3d 575, 581 (2000)).

■ Even though Nurse Strader was a licensed registered nurse with certification as an emergency room nurse, Greenview notes that she was not certified in geriatrics or wound care, never taught geriatrics or nursing, and never worked in a nursing home. However, Nurse Strader stated that she was director of nurses for a home health care service with many older non-ambulatory clients, treated patients with pressure ulcers in the emergency room, and had been a shift supervisor at a small hospital.

■ Further, in evaluating whether the proposed expert is qualified, Kentucky case law indicates that the trial court must determine only whether the expert has adequate, rather than outstanding qualifications. *See* Lawson, *The Kentucky Evi-*

cuss this aspect and does not appear to chal-

*dence Law Handbook,* § 6.15[4], at 433; *Owensboro Mercy Health System v. Payne,* Ky.App., 24 S.W.3d 675, 677–78 (2000). While an expert witness must have some knowledge of the area, the fact that a medical witness is not a specialist in a particular field goes more to the weight to be given his/her testimony than to its admissibility or the competence of the witness to qualify as an expert. *Owensboro Mercy Health System, supra* at 677. *See also Cree v. Hatcher,* 969 F.2d 34, 38–39 n. 5 (3rd Cir.1992); *Murphy by Murphy,* 957 S.W.2d at 298–99 (mechanical engineer qualified to testify as expert and lack of expertise in area of design and manufacture of escalators goes to weight not admissibility). Nurse Strader had some training in wound care and practical experience in recognizing and treating pressure ulcers in geriatric patients. Moreover, she was familiar with nursing procedures. Greenview extensively cross-examined Nurse Strader on her qualifications and the formulation of her opinions. As a result, we believe the trial court did not abuse its discretion in finding Nurse Strader qualified to testify as an expert on the breach of the standard of care by the nursing staff.

■ Greenview contends the trial court erred by allowing Thomas to introduce evidence of the full medical expenses billed, rather than the lesser amount actually payable to the healthcare providers including reductions under contracts through the Medicare program. *Cf. Our Lady of Mercy Hospital v. McIntosh,* Ky., 461 S.W.2d 377 (1970)(plaintiff may recover amounts paid under Medicare). Thomas maintains that excluding evidence on the full amount of the hospital expenses would violate the collateral source rule. *See Burke Enterprises, Inc. v. Mitchell,*

lenge her expert status on this issue.

Ky., 700 S.W.2d 789 (1985); *Taylor v. Jennison*, Ky., 335 S.W.2d 902, 903 (1960). Greenview's argument on appeal is directed solely at combating Thomas's argument that reducing the expense evidence would violate the collateral source rule. Despite the fact we agree that the collateral source rule does not apply because the reduction involves amounts written-off and never subject to indemnification or paid by a third-party source, Thomas was entitled to present the full amount to the jury.

In *Beckner v. Palmore*, Ky.App., 719 S.W.2d 288 (1986), the court held that a plaintiff is entitled to introduce evidence of all medical expenses incurred related to treatment even though the plaintiff could not recover certain amounts of the expenses. The court stated that evidence of the medical expenses was relevant to plaintiff's claim for pain and suffering and the trial court could prevent double recovery by reducing the jury award, if need be, following the trial. Although *Beckner* differs from the current situation because it involved expenses actually paid by the third-party insurers, we believe the underlying rationale still applies. Reducing the medical expense evidence by the amount written-off by Greenview would have unfairly prejudiced Thomas's claim for pain and suffering by affecting the perception of the extent of treatment accorded Rhodes, and necessarily the potential for pain and suffering. Accordingly, the trial court acted properly in allowing Thomas to introduce the full amount of the medical expenses billed and then reducing the judgment to the amount payable to the providers following the trial.

Finally, Greenview maintains the trial court abused its discretion in permitting Thomas to refer to Columbia HCA Healthcare as the owner or sole shareholder of Greenview Hospital, Inc. Greenview asserts that the information concerning Columbia HCA was inadmissible as irrelevant under KRE 402 because Columbia HCA and Greenview Hospital, Inc. are separate corporate entities and no negligence was being asserted against Columbia HCA. *See, e.g., Harlan Pub. Serv. Co. v. Eastern Const. Co.*, 254 Ky. 135, 71 S.W.2d 24, 28 (1934). Greenview also claims the references to Columbia HCA were unduly prejudicial under KRE 403 as a veiled attempt to implicate potential "deep pockets" or financial resources available to the defendant.

The trial court initially denied Greenview's motion in limine seeking to exclude all reference to Columbia HCA and allowed Thomas to refer to and question the venire about possible connections of the panel members to Columbia HCA. A dispute arose about the questioning during voir dire, so the trial court allowed Thomas's attorney to restate the relationship between Columbia HCA and Greenview Hospital, Inc. in her opening statement and again in the questioning of Nurse Petra in order to clarify the attorney's statements made during voir dire. Another reference occurred when Thomas's attorney asked Nurse Akin about the hospital's practice of renting, rather than purchasing, air mattresses from a company in Nashville, Tennessee, where Columbia HCA is located, in order to reduce costs. Greenview did not object to this questioning at the time, so it was not properly preserved for review despite the filing of the motion in limine. *See Tucker v. Commonwealth*, Ky., 916 S.W.2d 181 (1996). The final reference occurred when Thomas's attorney questioned Dr. Sims about his having privileges to admit and treat patients at other Columbia HCA affiliated hospitals, in addition to Greenview. Again, Greenview did not preserve the alleged error with a contemporaneous objection to this questioning.

In addition to the lack of preservation, Greenview has not shown that the trial court abused its discretion in permitting references to Columbia HCA. The questioning during voir dire was proper to elicit potential juror bias. The question posed to Dr. Sims was relevant to determine potential bias of that witness. The references during the opening statement of Thomas's attorney and questioning of Nurse Petra were proper to clarify statements made by the attorney in voir dire. Moreover, as the trial court stated before trial, the association between Columbia HCA and Greenview Hospital was well known in the community and Columbia HCA's name was on several of the documents introduced into the trial. Consequently, even if admitted erroneously, these few references to Columbia HCA during a six-day trial constituted harmless error. *See* CR 61.01.

For the foregoing reasons, the judgment of the Warren Circuit Court is affirmed.

ALL CONCUR.