ACREE, JUDGE:
Burke Rhoads, a police officer with the City of Nicholasville, died as a result of a three-car accident. A jury apportioned most of the fault for the accidents to Rhoads, though it also apportioned some to the other two drivers, Chasity Gordon and Sean Abraham. Rhoads's estate and the City of Nicholasville Police Department (collectively Appellants) claim the trial court erred by refusing to give a sudden emergency instruction and by limiting the testimony of an expert witness, Richard Parkos. Appellants also raise several arguments about the collateral source rule. We *642 agree with Appellants regarding the refusal to give a sudden emergency instruction and the limitation on Parkos's testimony but cannot grant relief on the basis of their collateral source rule arguments.
I. Factual and Procedural History
On the morning of March 11, 2015, Rhoads was driving his police cruiser southbound on US 27 while Gordon was approaching US 27 from a side street. It is uncontested that Rhoads had the right of way. Intending to proceed north, Gordon turned left across US 27's southbound lanes. Rhoads swerved left, toward the center turn lane/median, whereupon he collided with Gordon's vehicle. Rhoads's cruiser then began to spin and crossed over to the northbound lanes of US 27, where it collided with the Abrahams' vehicle.
The Abrahams sued Gordon, Rhoads's estate, and the Nicholasville Police Department and the case proceeded to a multi-day jury trial. The jury apportioned 70% of the fault to Rhoads, 29% to Gordon, and 1% to Abraham. Appellants were ordered to pay a total of over $1.38 million in damages to the Abrahams.[2] (R. at 1213).
II. Analysis
A. Sudden emergency instruction
1. General standards of review
A trial court "must instruct the jury upon every theory reasonably supported by the evidence." Sargent v. Shaffer , 467 S.W.3d 198, 203 (Ky. 2015). A party is entitled to an instruction based upon its "theory of the case if there is evidence to sustain it." Farrington Motors, Inc. v. Fidelity & Cas. Co. of N.Y. , 303 S.W.2d 319, 321 (Ky. 1957). "For the purpose of testing whether appellant was entitled to a 'sudden emergency' instruction, we will view the evidence in the light most favorable to him, as the jury had right to do." Ruehl v. Houchin, 387 S.W.2d 597, 599 (Ky. 1965).
Because deciding whether to give a jury instruction "inherently requires complete familiarity with the factual and evidentiary subtleties of the case that are best understood by the judge overseeing the trial[,]" a trial court has "some discretionary leeway in deciding what instructions are authorized by the evidence...." Sargent , 467 S.W.3d at 203-04. Accordingly, we review the decision of whether to give an instruction under the abuse of discretion standard. Id. at 203. To constitute an abuse of discretion, a decision must be "arbitrary, unreasonable, unfair, or unsupported by sound legal principles." Id.
2. Trial court erred by refusing to instruct on sudden emergency
Appellees' defense of the trial court's sudden emergency ruling is grounded on the shifting sands of a contested fact-they assert Rhoads drove his cruiser at an unreasonable speed, thereby creating the emergency and depriving him of the right to the instruction. Rhoads argues that because the reasonableness of the speed was a contested fact never decided by the jury, the trial court's exercise of discretion to refuse the instruction would have been abusive. We agree.
However, the trial court never exercised discretion whether to give the instruction because of a misapprehension of the law. The court stated, "I don't give that [sudden emergency instruction] anymore," expressing a belief that the instruction is generally incompatible with comparative negligence principles. (VR 4:12:17, 3:26:25). The assumption that the sudden emergency *643 doctrine was subsumed in the comparative fault doctrine yielded an erroneous legal ruling. Because the defense remains viable, and because the reasonableness of Rhoads's speed was a contested issue of fact, we cannot affirm the trial court on the basis that the ruling was not an abuse of discretion.
The sudden emergency doctrine remains "a necessary component of the process by which juries must determine the fault of parties who, finding themselves suddenly and unexpectedly in a position of imminent peril, respond in a way that might otherwise breach a specific duty of due care." Henson v. Klein , 319 S.W.3d 413, 418 (Ky. 2010). Quoting from a treatise, our Supreme Court further defined the sudden emergency doctrine as follows:
[W]hen an actor is faced with a sudden and unexpected circumstance which leaves little or no time for thought, deliberation, or consideration, or causes the actor to be reasonably so disturbed that the actor must make a speedy decision without weighing alternative courses of conduct, the actor is not negligent if the actions taken are reasonable and prudent in the emergency context, provided the actor has not created the emergency.
Id. (quoting 57A Am. Jur. 2d, Negligence § 198 (2004) ).
A trial court should give a sudden emergency instruction "when an actor is under specific duties prescribed by statute, and the ability to conform to those duties is affected by the presence of a sudden and unexpected peril." McAlpin v. Davis Const., Inc. , 332 S.W.3d 741, 743 (Ky. App. 2011) (internal quotation marks and citation omitted); accord Harris v. Thompson , 497 S.W.2d 422, 428 (Ky. 1973) ("[W]hen a defendant is confronted with a condition he has had no reason to anticipate and has not brought on by his own fault, but which alters the duties he would otherwise have been bound to observe, then the effect of that circumstance upon these duties must be covered by the instructions."). If a party is confronted with a sudden emergency, "[t]he fact that his [responsive] choice [to the emergency] may not have been the best choice will not deprive him of the sudden emergency instruction." Mudd v. Mudd , 710 S.W.2d 236, 237 (Ky. App. 1986).
But as the Abrahams stress, a party is not entitled to a sudden emergency instruction if the requesting party "created the emergency by his own negligence" because "[t]o hold otherwise would give a careless automobile driver a right to claim the benefit of a sudden emergency...." Mitchell v. Mitchell , 428 S.W.2d 222, 223 (Ky. 1968). The question of whether the emergency was created by the party seeking the instruction is an "issue[ ] of fact to be resolved by a well informed and properly instructed jury." Henson , 319 S.W.3d at 423. See also McAlpin , 332 S.W.3d at 744 ("Whether [the accused tortfeasor] was confronted with a sudden emergency is a question of fact for the jury, and if the evidence supports such a finding, the jury will be given a sudden emergency instruction."). A sudden emergency instruction should be given in situations where there is conflicting evidence regarding whether the requesting party created the emergency.
A similar scenario is presented in Swope v. Fallen , 413 S.W.2d 82 (Ky. 1967). In that case, the trial court's refusal to instruct on sudden emergency was reversed. "The evidence d[id] not warrant the conclusion that as a matter of law the [proponent of the instruction] created the emergency condition in which he found himself because he was driving at an excessive rate of speed, failed to have his car under control, and failed to keep a proper lookout."
*644 Id. at 85. In the case before us now, as in Swope , "[w]hile there was evidence of excessive speed there was evidence to the contrary." Id. As we discuss below, some of that contrary evidence was improperly excluded.
Contrary to the trial court's understanding, the Kentucky Supreme Court explained in Henson that the sudden emergency doctrine is not inconsistent with comparative negligence. Henson , 319 S.W.3d at 422-23. The opinion even includes a section heading stating, "The Advent Of Comparative Negligence Did Not Eliminate The Need To Instruct Juries On Sudden Emergency [.]" Id. at 422.
Satisfied that the doctrine is still a viable part of our jurisprudence, we turn to the substantive question whether the evidence in this case justified Rhoads's demand for the instruction. The parties do not differ dramatically in their position as to whether Rhoads was faced with a sudden emergency when Gordon cut across his lane of travel; rather, their main disagreement is whether Rhoads created that emergency by driving too fast.
The evidence of Rhoads's speed is conflicting. For example, there was evidence that Rhoads's cruiser was traveling between 50 and 52 miles per hour (mph) when it struck the Abrahams' vehicle, and other evidence that its speed was 42.2 mph. (VR 4:12:17, 2:01:58). The Abrahams presented expert testimony that Rhoads was going about 56.9 mph when he collided with Gordon's vehicle. (VR 4:12:17, 2:03:10). But the expert further testified he would "always put a plus or minus five percent on his numbers because ... we don't deal in exact numbers ... sometimes there's pieces missing...." (VR 4:12:17, 2:06:24). Based on this acknowledgement, the testimony of even Abrahams' expert put Rhoads's speed at the time of impact with Gordon's vehicle in a range between 54.055 mph and 59.745 mph. Also, as discussed below, the trial court did not allow Rhoads's expert to testify that he saw no evidence indicating Rhoads was exceeding the speed limit when he struck Gordon's vehicle.
Upon those facts, a reasonable jury could have decided either way whether Rhoads created or simply attempted to avoid a sudden emergency. As Swope indicates, the trial court should have given a sudden emergency instruction because of this conflicting evidence. Swope , 413 S.W.2d at 85.
A trial court's failure to properly instruct a jury is presumed to be prejudicial. See, e.g., Morgan v. Scott , 291 S.W.3d 622, 640 (Ky. 2009). Considering the substantial jury verdict, we cannot conclude that the refusal to give a sudden emergency instruction was so inconsequential as to be a mere harmless error. We must vacate the judgment.
Because the other arguments raised by Appellants are likely to recur upon remand, we will address them.
B. Limitation of Testimony of Richard Parkos
Appellants contend the trial court erred by prohibiting their expert, Richard Parkos, from testifying in accordance with his written report that he found no evidence showing Rhoads exceeded 55 mph. We agree.
In determining whether to admit expert testimony, a trial court must consider "whether the testimony is reliable, a factual determination, and whether the testimony will assist the trier of fact in understanding or determining a fact in issue, an admissibility determination." Oliphant v. Ries , 460 S.W.3d 889, 897 (Ky. 2015). We review the reliability determination *645 for clear error and the admissibility determination for abuse of discretion. Id.
Parkos retrieved electronic data from the vehicles and prepared an undated, one-page report on Kentucky State Police letterhead. Among others, that report includes two statements indicating: (1) Rhoads's cruiser was traveling between 50 and 52 mph when it collided with the Abrahams' Cadillac, and (2) "[a]lthough the [police] vehicle had been previously struck and rotated [by Gordon's vehicle], no evidence would indicate a speed greater than the posted speed limit of 55 mph." (R. 589).
Without objection, Parkos testified about the speed of the cruiser when it struck the Abrahams-the first referenced statement in his report. (VR 4:12:17, 11:40:05). The Abrahams objected only when Parkos was asked his opinion relating to the second statement-whether Rhoads's "top speed" exceeded 55 mph. (Id. at 11:40:10). The objection was sustained.
The Abrahams' objection was not based on Parkos's lack of credentials. Instead, they emphasize that Parkos was not the lead reconstructionist, but tasked primarily with obtaining the electronic "black box" information from the vehicles. (Id. at 11:40:38-11:41:18). Unlike the Abrahams' expert, Parkos had not applied the physical laws and mathematics to extrapolate an estimate of Rhoads's speed when he struck Gordon's vehicle. We do not think this matters.
When it comes to admissibility, nothing distinguishes Parkos's testimony about Rhoads's speed when he struck the Abrahams' vehicle from that about Rhoads's speed when he struck Gordon's vehicle. Parkos's testimony about the lack of evidence of Rhoads's excessive speed is more assailable on cross-examination than his reporting of the "black box" data. But that is a question of the weight of the evidence, not of its admissibility.
Our concerns are not assuaged by the Abrahams' argument that Parkos would have impermissibly testified that Rhoads's speed was "reasonable." To the contrary, by stipulation of all counsel, Parkos would only have testified that he saw no evidence that Rhoads was going more than 55 mph. Whether Rhoads's speed was reasonable would have remained a matter for the jury.
Next, the Abrahams argue that Appellants did not timely disclose Parkos as an expert under Rule 26. That assertion is not supported by the record. They failed to object to Parkos's expert testimony about the speed Rhoads was traveling when he collided with them. We cannot reconcile their claim that lack of notice prevents Parkos's testimony about Rhoads's speed at the first collision with their decision not to object to his testimony about Rhoads's speed at the second collision. More significantly, the Abrahams included Parkos's report as a portion of their own pretrial response to a motion in limine by the City of Nicholasville. (R. at 577-91). That response states that "[a]ll parties have had the same information and the same statement from prior to the inception of the litigation.... There certainly is no surprise or different information." (R. at 580). Thus, the Abrahams' argument that they had insufficient notice of Parkos's conclusions is unavailing.
Parkos's testimony was relevant and could well have assisted the jury in its determination whether Rhoads created the emergency. The court abused its discretion by prohibiting Parkos's testimony.
C. Collateral Source Rule
As summarized by our Supreme Court, the collateral source rule "allows the plaintiff to (1) seek recovery *646 for the reasonable value of medical services for an injury, and (2) seek recovery for the reasonable value of medical services without consideration of insurance payments made to the injured party." Baptist Healthcare Systems, Inc. v. Miller , 177 S.W.3d 676, 682 (Ky. 2005). Essentially, "[i]t is improper to reduce a plaintiff's damages by payments for medical treatment under a health insurance policy if the premiums were paid by the plaintiff or a third party other than the tortfeasor." Id.
The Abrahams introduced evidence of medical expenses approaching $600,000, but the Appellants were prevented by application of the collateral source rule from introducing evidence that the Abrahams paid very little of that amount; Medicaid paid slightly more than twenty percent, with much of the remainder having been discounted or written off.
Appellants' main argument is that the collateral source rule should be abrogated. However, we lack the authority to reverse decisions of our Supreme Court.
Alternatively, Appellants argue the trial court properly permitted the Abrahams to introduce the full billed amounts but urge us to conclude that evidence of discounts, write-offs and actual payments is also admissible. That approach is simply a different face on the same argument and was rejected by the Kentucky Supreme Court in Baptist Healthcare Systems . In that case, the majority held that:
it is absurd to suggest that the tortfeasor should receive a benefit from a contractual arrangement between Medicare and the health care provider. Simply because Medicare contracted with [a tort victim's] physician to provide care at a rate below usual fees does not relieve a tortfeasor from negligence or the duty to pay the reasonable value of [the tort victim's] medical expenses. Therefore, we hold that evidence of collateral source payments or contractual allowances was properly withheld from the jury and her award of medical expenses was proper.
Id. at 683-84 (emphasis added).
Finally, Appellants argue that the trial court should have issued a post-trial order limiting damages to the amount of expenses actually paid. Indeed, we once approved that approach, though our opinion was issued prior to Baptist Healthcare Systems . Thomas v. Greenview Hosp., Inc. , 127 S.W.3d 663 (Ky. App. 2004), overruled on other grounds by Lanham v. Commonwealth , 171 S.W.3d 14 (Ky. 2005).
In Thomas , the trial court granted a post-trial motion to reduce the medical expenses award to the "actual amount owed by or paid on behalf of the estate after adjustments to the charges under the Medicare program." Id. at 668-69. We initially noted in dicta that "the collateral source rule does not apply because the reduction involves amounts written-off and never subject to indemnification or paid by a third-party source...." Id. at 675. Our conclusion in Thomas that write-offs do not fall within the collateral source rule is inconsistent with the treatment of Medicare write-offs in Baptist Healthcare Systems . See 177 S.W.3d at 682-84.
We also held in Thomas that the plaintiff was properly permitted to present the full medical bills to the jury because "[r]educing the medical expense evidence by the amount written-off by Greenview [Hospital] would have unfairly prejudiced Thomas's claim for pain and suffering by affecting the perception of the extent of treatment ... and necessarily the potential for pain and suffering." Id. at 675. We then simply declared-without citing any supporting authority-that "the trial court acted properly in allowing Thomas to introduce the full amount of the medical *647 expenses billed and then reducing the judgment to the amount payable to the providers following the trial." Id. Seizing on that sweeping statement, Appellants argue the trial court should have issued a similar post-trial order.
We begin by noting that Thomas is an anomaly. We have seen no case from a Kentucky appellate court reaffirming our holding in Thomas that a trial court should limit damages to the amounts actually paid.[3]
The chief benefit of limiting damages by post-trial order, as stressed by Appellants, would be to avoid a "windfall" for the Abrahams. However, our Supreme Court was manifestly unconcerned with windfalls in Baptist Healthcare Systems, Inc. At least four times in that opinion the Court noted how the collateral source rule could create windfalls, but it expressed no concern over that possibility. Specifically, the Court held:
In O'Bryan v. Hedgespeth, [892 S.W.2d 571, 576 (Ky. 1995) ] we stated that "[c]ollateral source benefits may relate to the plaintiff's need to recover damages from the wrongdoer, but they have no bearing on the plaintiff's right to recover such damages." We held in O'Bryan that a liability insurance company should not receive a windfall for benefits the plaintiff is entitled to. We reasoned that because the insured procured a policy and paid the premiums that the benefits, including a windfall, inured to them. The recent Court of Appeals decision in Schwartz v. Hasty [, 175 S.W.3d 621, 626 (Ky. App. 2005),] reiterates the reasoning in favor of providing an injured party with any windfall associated with collateral source payments.
First, the wrongdoer should not receive a benefit by being relieved of payment for damages because the injured party had the foresight to obtain insurance. Second, as between the injured party and the tortfeasor, any so-called windfall by allowing a double recovery should accrue to the less culpable injured party rather than relieving the tortfeasor of full responsibility for his wrongdoing. Third, unless the tortfeasor is required to pay the full extent of the damages caused, the deterrent purposes of tort liability will be undermined.
Along with the considerations underlying granting any windfall to the injured *648 party is the fact that [the plaintiff] paid her premiums and deserves all appropriate benefits. Moreover, it is absurd to suggest that the tortfeasor should receive a benefit from a contractual arrangement between Medicare and the health care provider. Simply because Medicare contracted with [the plaintiff's] physician to provide care at a rate below usual fees does not relieve a tortfeasor from negligence or the duty to pay the reasonable value of [the plaintiff's] medical expenses. Therefore, we hold that evidence of collateral source payments or contractual allowances was properly withheld from the jury and her award of medical expenses was proper.
Baptist Healthcare Systems, Inc. , 177 S.W.3d at 683 (emphasis added).
Moreover, our Supreme Court was certainly aware of Thomas at the time it issued Baptist Healthcare Systems . In fact, the dissent in Baptist Healthcare Systems specifically discussed Thomas . 177 S.W.3d at 690 (Cooper, J., dissenting in part). However, the majority chose to not adopt Thomas 's framework. The rejection of Thomas would have been clearer if the majority had explicitly discussed that holding. Nevertheless, one cannot reasonably dispute that the majority could have but did not adopt Thomas 's approach for reducing damage awards post-trial. Instead, the majority held that the "award of medical expenses was proper." Id. at 684. In fact, a more reasonable argument is that Thomas has been overruled sub silentio by Baptist Healthcare Systems .
Against that backdrop, we cannot say it was error for the trial court to decline to follow the post-judgment remittitur procedure in Thomas . Any modifications to the collateral source rule, including adopting the procedure discussed in Thomas , must come from our Supreme Court.
III. Conclusion
For the foregoing reasons, the judgment of the Garrard Circuit Court is vacated and remanded for further proceedings consistent with this opinion as to the failure to give a sudden emergency instruction and the limitation upon Parkos's testimony and is otherwise affirmed.
ALL CONCUR.

Though she also was ordered to pay damages to the Abrahams and is a named Appellee, Gordon has not filed a brief or otherwise participated in this appeal.

Appellants assert that we followed Thomas in Leighton v. CSX Transp., Inc. , 338 S.W.3d 818 (Ky. App. 2011). But we repeatedly emphasized in Leighton that it did not involve application of the collateral source rules. Id. at 822 ("We agree with the trial court. The Plan is not a collateral source.... Leighton's argument that the jury instruction was improper is premised entirely on the pre-supposition that the Plan was a collateral source. Since we conclude it was not, Leighton's argument cannot be sustained.... Given that the Plan was not a collateral source of payment for Leighton's medical expenses, there was no error in the jury instruction that limited Leighton to recovery of his out-of-pocket expenses only.").
However, Thomas was persuasive to the United States District Court for the Western District of Kentucky in rendering Rideout v. Nguyen , 2008 WL 3850390, at *1 (W.D. Ky. Aug. 15, 2008) ("Defendants do not dispute the application of the collateral source rule, but instead argue that the collateral source rule does not permit the Plaintiff to recover amounts for which she, nor the collateral source, were liable, such as amounts written off or forgiven by a healthcare provider. The Court will permit the introduction of the full amount of the medical expenses billed. If a verdict is returned in favor of Plaintiff, the Defendants may, if necessary, file a post-trial motion to reduce the amount of judgment after the trial pursuant to Thomas .") (citation omitted). The case is neither precedent nor persuasive in this context. See Johnson v. Fankell , 520 U.S. 911, 916, 117 S.Ct. 1800, 1804, 138 L.Ed. 2d 108 (1997).