RENDERED: NOVEMBER 3, 2023; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2022-CA-1320-MR

HAWA MOHAMED; IBRAHIM
MUYA; AND F.I., A MINOR                                        APPELLANTS

|   |   |
|---|---|
| v. | APPEAL FROM JEFFERSON CIRCUIT COURT<br>HONORABLE SUSAN SCHULTZ GIBSON, JUDGE<br>ACTION NO. 17-CI-005185 |

LISA BERGER; AND STATE FARM
MUTUAL AUTOMOBILE
INSURANCE COMPANY                                              APPELLEES

<u>OPINION</u>
<u>AFFIRMING</u>

** ** ** ** **

BEFORE:  EASTON, ECKERLE, AND JONES, JUDGES.

EASTON, JUDGE:  The Appellants, Hawa Mohamed ("Mohamed"), Ibrahim

Muya ("Muya"), and Hawa Mohamed, as next of kin for F.I., a minor ("F.I.")

(collectively "Appellants"), appeal from the Jefferson Circuit Court's Order of

Judgment dismissing the Appellants' claims with prejudice after a jury returned a

verdict in favor of the Appellee, Lisa Berger ("Berger"). The Appellants allege the circuit court made evidentiary errors during the trial. Having reviewed the record and the applicable law, we affirm.

## FACTUAL AND PROCEDURAL HISTORY

On October 27, 2016, Berger's car rear-ended the car Mohamed was driving. Passengers in Mohamed's car included Muya, F.I., and another minor child. Mohamed's car was stopped in traffic at a red light when the impact occurred. Mohamed was driving a rental car owned by Enterprise Rent-A-Car ("Enterprise"), while Berger was driving her own car. After the collision, the rental car was returned to Enterprise.

Appellants filed suit on October 2, 2017 in the Jefferson Circuit Court. The Complaint alleged Berger's negligent operation of her car caused the collision. The Complaint stated all three Appellants suffered injuries because of the accident. The Complaint also initially named State Farm Insurance ("State Farm") as a defendant. The allegations against State Farm were bifurcated, and given the result of the trial, that claim has not proceeded further. State Farm is not a participant in this appeal.

The Appellants indicated English is not their primary language. Interpreters were utilized throughout the case. Language presented challenges, especially when witnesses were impeached with prior testimony.

Depositions of all three Appellants were taken. The first law enforcement officer on the scene, Eric Brandes ("Officer Brandes") was also deposed. A representative of Enterprise, Christopher Buck, was deposed as well.

On September 18, 2019, the Appellants filed a Motion for Partial Summary Judgment. Because Berger conceded liability for the accident in her Answer, Appellants asked the court to grant them summary judgment on liability. Berger's response admitted liability, but she disputed the accident caused any injuries that required medical care. The circuit court granted summary judgment to the Appellants on liability, but the court found an issue of material fact regarding causation of any claimed injuries.

Berger filed her expert witness disclosure in late 2019. She disclosed C. Brian Tanner ("Tanner"), an engineer, as her expert. Appellants filed a motion to exclude his testimony four days later. On October 6, 2020, the circuit court held a *Daubert*[1] hearing to determine if it would allow Tanner to testify. The circuit court found he qualified as an expert in engineering and could testify about biomechanics. The circuit court ruled, however, that Tanner could not testify regarding any medical causation. It limited his causation testimony to generally

---

[1] *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993).

giving examples of daily activities that would be consistent or inconsistent with the force experienced by the Appellants in the accident.

The circuit court set an initial trial date of January 7, 2020. The circuit court issued a pretrial order that outlined discovery deadlines and ordered mediation. Multiple continuances of the trial occurred. Finally, a jury trial began on September 13, 2022.

Prior to testimony beginning, Appellants renewed their motion to exclude Tanner's testimony. They claimed his math did not "add up" and that he essentially "made up" the speed he used in his calculations. The circuit court responded that Appellants were in possession of his calculations for quite some time. The court stated the Appellants could have asked Tanner about all these questions in a deposition, yet they chose not to do so. The court declined to exclude Tanner's testimony; however, the circuit court stated it may consider questioning him outside the presence of the jury if it became necessary to do so.

Before jury selection, Berger's counsel asked the court to make clear to the Appellants that they may not mention "insurance" in their testimony in front of the jury. There had been a prior ruling that the word "insurance" may not be used, and the court reiterated this ruling at this time. The court stated to all the parties that there shall be no mention of insurance coverage, insurance companies, insurance agents, or insurance policies, and that if someone were to mention any of

-4-

these, it would bring the trial "to a very fast halt."[2]  At this point, the only objection Appellants' counsel raised to this ruling was that he likes to ask potential jurors during voir dire if anyone worked for an insurance company.  The court replied that voir dire is a separate issue, and he would be allowed to ask this question.

Once the jury was selected, Appellants began their case in chief. They called two chiropractors who treated the Appellants (Dr. Watley and Dr. Krawchison), a family physician who treated F.I. (Dr. Lach), and a medical expert (Dr. Barrett).  All three Appellants also testified.

Both treating chiropractors and the family physician testified similarly.  They all testified that the parties complained of headaches, back pain, neck pain, and shoulder pain.  Dr. Lach and Dr. Krawchison testified that F.I. suffered from muscle spasms after the accident.  Additionally, Muya suffered from pain in his right ankle and right wrist.  Likewise, Mohamed had pain in her arms and legs.  All treatment providers testified the Appellants suffered from acute injuries due to the motor vehicle accident that occurred on October 27, 2016.

None of the treatment providers believed Appellants were exaggerating or falsifying their injuries.  The treatment providers testified that all three Appellants sought treatment for approximately three months and reached maximum medical improvement.  All treatment providers testified as to their bills,

---

[2] Trial, 9/13/2021, 10:59:31.

-5-

and stated they believed all the treatment Appellants received was reasonable and necessary, and that their bills were reasonable.

Much like their direct testimony, the treatment providers testified similarly during their cross-examinations. They all stated that previous medical history is important in treating patients. They testified they did not know of any prior injuries the Appellants had. All were apparently unaware of a previous motor vehicle accident Muya had been involved in approximately seven months prior to the accident in question.

Appellants' expert witness, Dr. Mark Barrett, confirmed the treatment providers. He believed, based on his review of the parties' medical records, that the treating physician and chiropractors' diagnoses of the Appellants were accurate. Dr. Barrett noted they all had similar injuries, which he claimed was not unusual. He saw nothing unexpected in their records, and he saw no reason to question the diagnoses or their injuries as genuine. He stated there are ways to determine if someone is faking or exaggerating an injury, and he saw no indication of that in any of the records.

During his cross-examination, Dr. Barrett stated he did not treat or speak with the Appellants himself. He admitted his opinions are based upon the accuracy of the statements in the records, and if there were any inaccuracies, they would impact his opinion. Dr. Barrett acknowledged it is important to have a

correct history of the patient to give opinions and provide effective treatment. He stated Muya's prior motor vehicle accident was not referenced in any of the chiropractic records he reviewed. He additionally said he was not provided with any information regarding the damage to the vehicles, but he said this was irrelevant. Dr. Barrett opined it is possible for the occupants of a vehicle to be injured even if the damage to the vehicle was minimal.

F.I. was the first of the Appellants to testify. She was ten years old when the accident occurred and sixteen at the time of the trial. She said she had no previous injuries prior to the accident, and she was able to do normal daily activities. After the accident, her activity was very limited because of pain. She missed several days of school. The pain in her neck made it difficult to sleep.

On cross-examination, Berger's counsel asked F.I. if she was wearing her seat belt at the time of the accident. He also asked if her younger brother (age two at the time of the accident) was in a car seat. She replied affirmatively to both questions. Berger's counsel then pointed to her deposition testimony (taken approximately two years after the accident and four years prior to trial), in which she stated she was not wearing a seat belt and that her brother was sitting in her lap at the time the accident occurred. She replied she did not remember giving that testimony.

F.I. testified her mother was driving. During cross-examination, she was asked if her parents had switched seats at any point. F.I. replied that they had because her father wasn't feeling well. Again, Berger referred to F.I.'s deposition testimony where she stated her father has headaches often and asked if a headache was the reason her mother took over driving. F.I. responded that she did not recall.

Berger additionally asked about her parents having pain prior to the accident. F.I. said she was unaware of her parents having any issues prior to this accident. Again, her deposition was referenced, in which she testified her father had an injured leg prior to this accident. She further stated in her deposition that she and her younger siblings would massage her mother's arms and legs because of pain before this accident. Again, F.I. stated she did not recall saying any of this.

Mohamed then testified. She stated she had no pain prior to the accident, but afterwards, she had trouble sleeping due to the pain she experienced. She first sought treatment the day after the accident.

During cross-examination, Berger brought up several inconsistencies between Mohamed's trial and deposition testimony. For example, in her deposition, Mohamed stated she was driving because Muya had a headache. At trial she was driving because she wanted to drive the rental car. At trial Mohamed said she did not have a smartphone so she could not take pictures of the vehicles; at her deposition, she said she did have a smartphone that had the ability to take

-8-

photographs. Her trial testimony was that she sought treatment the day after the accident; her deposition testimony was that she did not seek treatment for about a week after the accident.

Mohamed's chiropractor records stated she hit her left shoulder on the door upon impact; she testified at trial that this did not occur. Upon being asked about these inconsistencies, Mohamed states she did not understand many of the questions being asked during the deposition and there was a miscommunication or mistranslation. It was unclear if the translator present during the depositions was certified or what agency employed the translator. Neither Appellants' current counsel nor Berger's trial counsel were present at the depositions to give any insight to the court regarding the translator.

Ibrahim Muya was the final witness to testify for Appellants. He testified he had no issues prior to this accident. He acknowledged he had been in a previous accident with similar injuries, but he stated those injuries had healed completely before this accident. He stated he badly injured his neck, back, shoulder, leg, and ankle. His first chiropractor visit was an after-hours emergency visit, which occurred the evening of the accident. He stated the pain was so severe he needed painkillers just to sleep.

During Muya's cross-examination, Berger's counsel again points to significant disparities between Muya's deposition testimony and his trial

testimony. Muya stated the rental car they were in sustained heavy damage, while his deposition testimony describes the damage as only a small dent in the bumper. In his deposition, Muya denied going to the chiropractor the day of the accident.

Muya was hostile to Berger's counsel during cross-examination. He appeared to take issue with Berger's counsel using the transcript of his deposition testimony, to which he stated: "I am not the one who publishes this information, I don't use the computer; you are the one who publishing this information."[3] "You are one of them."[4] "You should stop this line of questioning."[5] "You are the one who wrote this."[6] "Do not try to force me to say something I did not say."[7]

At this point, a bench conference occurred in which Berger's counsel requested to bring in deposition testimony from a separate lawsuit involving a subsequent motor vehicle accident Muya was in. In this deposition, Muya specifically states the chiropractor is lying when he said Muya was seen the day of the accident which is the subject of the trial in this case. Appellants' counsel objected, as he claimed he had not seen this deposition transcript. The circuit court

---

[3] Trial, 9/15/2022 at 4:03:09.

[4] *Id*. at 4:03:24.

[5] *Id*. at 4:04:41.

[6] *Id*. at 4:05:18.

[7] *Id*. at 4:06:57.

allowed some of the testimony to be brought in; however, it admonished counsel that the court did not want to bring in any information about the subsequent accident or lawsuit.

During this line of questioning, Muya also denies making the statements in this deposition. He claims there was no interpreter during this deposition. At a bench conference, the court determined based on the deposition transcript that there was in fact an interpreter present, although the interpreter was for Maay Maay, not Somali. Maay Maay is Mohamed's native language, while Somali is Muya's native language. Upon further questioning regarding his deposition testimony, Muya again denies making the statements quoted in the deposition transcript. Muya states that English is not his first language. He again accuses Berger's attorney of creating the deposition transcript. He stated Berger's counsel is trying to take advantage of him. He claims the testimony being read from the transcript did not occur. "I am getting angry right now, so please leave me alone."[8] At this point, the circuit court concluded for the day.

Upon reconvening the next morning, Muya's cross-examination continued. Berger's counsel commented that Muya acknowledged in his direct testimony the day before that he had been in a prior motor vehicle accident. But in his deposition Muya denied ever having been in an accident before. Muya testified

---

[8] *Id*. at 4:48:59.

-11-

he probably did not understand the question. Berger's counsel points to further deposition testimony in which Muya denies ever having any prior injuries or problems with the body parts he injured in the previous accident. Muya then stated it was because his prior injuries had healed completely before this accident took place. In response to Berger's final cross-examination question, Muya stated he did not miss any work following this accident.

The first witness Berger called was Officer Brandes, a retired LMPD[9] officer who responded to the accident scene. He testified he had no issues communicating with the parties in English, which gives us some pause about the translation difficulties claimed. Officer Brandes said he asked if anyone was injured or needed medical attention, and they all said no. Officer Brandes saw only minor damage to both vehicles. He elaborated that the car Appellants were driving had mostly transfer marks or paint damage and no structural damage. The damage to the front of Berger's car was a little more pronounced.

Officer Brandes estimated Berger's speed upon impact to be between fifteen and twenty miles per hour. He stated this speed was his best "guess," as no speed had been clocked with radar or observed. He stated this was consistent with rolling into someone's bumper.

---

[9] Louisville Metro Police Department.

Lisa Berger testified next. She remembered travelling approximately twenty miles per hour before applying the brakes when she saw Appellants' vehicle in front of her. She estimates the speed at impact was less than five miles per hour. Berger testified the damage to the vehicles was very minimal. She stated her vehicle already had several scratches on its front, and she could not tell if there was any additional damage to it after the accident occurred. She did not take any pictures of the damage to the vehicles, because it was so minor it didn't occur to her to do so.

Muya was the only occupant in Appellants' vehicle she spoke to. She claimed Muya did not appear to be injured or in pain. She stated he did not appear dazed or confused. Berger testified he appeared very alert. Muya responded to her questions quickly, so she believed he understood her.

Berger's next witness was Christopher Buck, who is a group risk manager for Enterprise. He testified as to the protocol when a rental car is returned to them. He stated that after a vehicle is returned, an agent does a walk-around inspection for any damages. He testified that if a car is returned with damage, Enterprise will open a claim. He states that damage is documented, and it goes into their system. For them to open a claim, the damage must meet a certain threshold to not be considered normal wear and tear. Buck testified that examples of damage to a bumper which would exceed the threshold would be cracks,

scratches longer than two to three inches, dents, or a misalignment. He stated that a dent would need to be at least the size of a quarter on a plastic bumper for them to open a claim.

While he did not inspect Muya's rental vehicle himself, Buck testified that Enterprise's system had no documented damage to the vehicle after Muya returned it to them. Buck said there would have been a notation in the system if any repairs were made to the vehicle after Muya returned it, and there were none. On cross-examination Buck admitted the vehicle was rented out again the morning following Muya's return, and there was noted damage to it after that return.

Berger's final witness was her expert witness, C. Brian Tanner. Tanner stated his ultimate opinion is that the collision between the vehicles resulted in a speed change of no more than five miles per hour to Mohamed's vehicle, with the acceleration being no more than 5G.[10] He further stated the Appellants' joints would not have moved more than their normal range of motion. He opined that the forces on their bodies would be like forces exerted by performing normal activities, such as rapidly descending a set of stairs, opening a heavy door, or flopping back onto a chair or bed.

---

[10] G is a unit for measuring forces, comparing them to the force of gravity, where Earth gravity equals 1G. John Papiewski, *What Does G Force Mean?*, SCIENCING.COM, Sciencing.com/what-does-g-force-mean-13710432.html (last updated Mar. 29, 2018).

Tanner testified that to reach his conclusions, he reviewed the accident report, the Complaint and response in the circuit court action, depositions of the Appellants and the investigating officer, the email and deposition of the Enterprise employee, data for the vehicles involved, and street level and aerial views of the accident scene. Additionally, he referenced previous tests he had performed with similar vehicles regarding the amount of damage the vehicles sustained when it hit an object while moving at a certain speed. Based on this information, he performed several calculations which led to his conclusions.

Tanner stated he estimated Berger's speed to be about four miles per hour upon impact with Mohamed's vehicle. He testified he determined this speed because he had performed a controlled test with an equivalent vehicle. During this test, the vehicle sustained significantly more damage than Berger's vehicle when it impacted a fixed barrier travelling at five miles per hour.

During his cross-examination, Tanner stated he disregarded Officer Brandes' speed estimate of fifteen to twenty miles per hour, because the amount of damage to the vehicles would have been significantly greater than the damage sustained in this collision if Berger had been travelling at that speed.

Appellants' counsel asked Tanner to "show his work" and solve his equations for the jury. Over objection, the circuit court initially agreed to allow it, although deemed "unusual." However, Tanner then stated to counsel and the court

that while he could solve the equations, he did not solve them by hand in his analysis. He stated he used a computer program called "Mathcad" to solve the equations. This program is used by engineers to save time and solve standard mathematical equations. Tanner stated it would take him one to two hours to solve them by hand and he would need a lot of paper. The court ruled that it would have no probative value to have Tanner solve his equations using pen and paper if that is not how he reached his conclusion.

At this point, Appellants renewed their motion to exclude Tanner's testimony. They alleged his method was never disclosed to them, and that no computer program was ever mentioned. They argue they have no information on this program or how reliable it is. After some argument, the court overruled Appellants' motion. The circuit court stated Appellants had the opportunity to challenge the calculations at the *Daubert* hearing, by deposition, or by hiring their own expert.

The jury returned with a verdict in favor of Berger. They found unanimously that the collision on October 27, 2016 was not a substantial factor in causing injuries alleged by Hawa Mohamed or Ibrahim Muya. Ten out of twelve jury members found that the collision on October 27, 2016 was not a substantial factor in causing the injuries alleged by F.I. They awarded nothing to the Appellants. The circuit court entered an Order of Judgment dismissing with

-16-

prejudice the claims against Lisa Berger on October 10, 2022. This appeal timely followed.

## STANDARD OF REVIEW

"In reviewing the exclusion of expert witness testimony, this Court applies an abuse of discretion standard." *Jackson v. Ghayoumi*, 419 S.W.3d 40, 43 (Ky. App. 2012). "The trial court has discretion to control the presentation of evidence. In the absence of any abuse, the reviewing court will not reverse the decision of the trial judge." *Pendleton v. Commonwealth*, 685 S.W.2d 549, 554 (Ky. 1985). Likewise, "the standard of review of an evidentiary ruling is abuse of discretion." *Cox v. Commonwealth*, 553 S.W.3d 808, 814 (Ky. 2018). "The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair or unsupported by sound legal principles." *Woodard v. Commonwealth*, 147 S.W.3d 63, 67 (Ky. 2004).

## ANALYSIS

Appellants claim the circuit court made several errors during the jury trial. First, they allege the circuit court erred in allowing defense expert Tanner to testify. They first claim that Tanner's methodology was not properly disclosed, and second, that his methodology did not meet the requirements of *Daubert*. Appellants also contend the circuit court erred in denying their request for Tanner to solve his equations in front of the jury.

Appellants' second contention of error is that the circuit court erred in barring any mention of the word "insurance" in the presence of the jury. They argue KRE[11] 411 does not require such a broad prohibition. Finally, Appellants claim the circuit court erred in allowing Muya to be cross-examined regarding deposition testimony from an unrelated case when it was not disclosed prior to trial.

### The Circuit Court Did Not Abuse Its Discretion in Allowing Tanner to Testify

Appellants claim the circuit court abused its discretion by not excluding the testimony of defense expert Tanner. They claim Berger failed to properly comply with the disclosure requirements of CR[12] 26.02(4)(a)(i).

CR 26.02(4)(a)(i) states:

A party may through interrogatories require any other party to identify each person whom the other party expects to call as an expert witness at trial, to state the subject matter on which the expert is expected to testify, and to state the substance of the facts and opinions to which the expert is expected to testify and a summary of the grounds for each opinion.

Appellants argue that because Tanner did not disclose that he had performed his mathematical calculations through a particular computer program, Berger did not sufficiently comply with discovery rules. While Berger did not initially disclose Tanner as an

---

[11] Kentucky Rules of Evidence.

[12] Kentucky Rules of Civil Procedure.

expert in her answer to Appellants' interrogatories, she did file her expert witness disclosure naming Tanner as her expert on November 8, 2019, well within the discovery timeframe.

Appellants do not argue that Berger failed to disclose Tanner's opinions or the basis of his opinions. Appellants take issue with the fact that Tanner performed the calculations he testified to by using a computer program, rather than doing them himself by hand.

The purpose of CR 26.02(4)(a)(i) is "to give the opposing party a chance to prepare for the trial itself." *Hicks v. Cole*, 566 S.W.2d 169, 171 (Ky. App. 1977). Berger's disclosure gave notice to Appellants what the basis of his testimony would be, and why. The only missing piece is what format was used to solve the calculations, whether by hand, use of a calculator, or even a computer application. Additionally, while Appellants claim they had no notice that Tanner used a computer program to solve his equations, that is simply not accurate. During the *Daubert* hearing, Tanner testified that he used software to solve his equations. He references "the software" several times. Appellants failed to ask any follow up questions. The circuit court stated:

> If you want to ask the questions how he got there, then there is enough information in the disclosure to point opposing counsel in that direction. So, the fact that there has not yet been a deposition, I don't think, that, to me, is important, but more importantly, the disclosures

themselves give the blueprint for the testimony and the outline for any questions that would be asked.[13]

The circuit court noted the expert witness disclosure was not simply conclusory; the disclosure here outlined the conclusions and the bases for them. The circuit court believed the expert witness disclosure was adequate to put Appellants on notice as to what the expert would testify to, and we agree.

Appellants seem to ignore the remainder of CR 26.02(4)(a), which states:

> After a party has identified an expert witness in accordance with paragraph (4)(a)(i) of this rule or otherwise, any other party may obtain further discovery of the expert witness by deposition upon oral examination or written questions pursuant to Rules 30 and 31. The court may order that the deposition be taken, subject to such restrictions as to scope and such provisions, pursuant to paragraph (4)(c) of this rule, concerning fees and expenses as the court may deem appropriate.

CR 26.02(4)(a)(ii).

The circuit court repeatedly asked Appellants if they had taken Tanner's deposition. As the circuit court determined in its decision to overrule their motion to exclude Tanner's testimony during trial, Appellants were in possession of Tanner's equations for at least a year, and they could have deposed

---

[13] Hearing of 10/6/2020 at 09:28:26.

him or hired their own expert to challenge his calculations. They chose to do neither, despite having ample opportunity to do so.

Appellants further argue that Tanner should not be allowed to testify as an expert under *Daubert* because the methods he employed in reaching his conclusions are unreliable. KRE 702 is the rule that applies to expert testimony. It states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if:
>
> > (1) The testimony is based upon sufficient facts or data;
> >
> > (2) The testimony is the product of reliable principles and methods; and
> >
> > (3) The witness has applied the principles and methods reliably to the facts of the case.
>
> Pursuant to *Stringer v. Commonwealth*:
>
> Expert opinion evidence is admissible so long as (1) the witness is qualified to render an opinion on the subject matter, (2) the subject matter satisfies the requirements of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), (3) the subject matter satisfies the test of relevancy set forth in KRE 401, subject to the balancing of probativeness against prejudice required by KRE 403, and (4) the opinion will assist the trier of fact per KRE 702.

956 S.W.2d 883, 891 (Ky. 1997).

The circuit court held a *Daubert* hearing in this action specifically to determine if Tanner would be able to testify as an expert at trial. After hearing Tanner testify, the court determined he was qualified as an expert in his field. Appellants did not object to Tanner's qualifications as an engineer, but as to his methods. The circuit court ruled that his calculations rest upon sound principles of mechanics and biomechanics. The circuit court believed his opinions regarding the forces put upon Appellants' bodies during the accident are within the expertise of a biomechanical engineer who deals with force acting upon other objects. The circuit court did rule, however, that Tanner could not testify as to medical causation, or lack thereof.

The factors for a trial court to apply to determine the admissibility of an expert's proffered testimony include: "(1) whether a theory or technique can be and has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) whether, with respect to a particular technique, there is a high known or potential rate of error and whether there are standards controlling the technique's operation; and (4) whether the theory or technique enjoys general acceptance within the relevant scientific, technical, or other specialized community." *Goodyear Tire & Rubber Co. v. Thompson*, 11 S.W.3d 575, 578-79 (Ky. 2000).

Tanner has a master's degree in engineering mechanics. He works in the areas of mechanical engineering and biomechanics. He's been employed with a forensic engineering firm since 1994. His work has an emphasis on motor vehicle accident reconstruction and biomechanical analysis. He has also worked with the National Highway Traffic Safety Administration. He has contributed to more than twenty peer reviewed publications. He has an engineering license in six states.

Tanner testified that based upon the description of the damage of the vehicles, he estimated the speed of Berger's vehicle. He stated visiting the actual scene would not be helpful, as there would be no relevant evidence remaining after the passage of that much time. Additionally, he stated the collision itself was the basis of his calculations, and the actual scene wouldn't add much value. He subsequently described his calculations, how he chose the values he did, and how he reached his conclusions. He used manufacturing information of the vehicles involved to determine the weight and build of the vehicles involved. He referenced collision tests he performed himself on the same or substantially similar vehicles when making his analysis. While no pictures of the vehicles involved in this collision existed for his review, the description of the damage to the vehicles was relatively consistent among all witnesses, and he took that information into account when estimating the speed of Berger's vehicle upon impact.

The fact that Tanner did not perform the actual calculations himself but used a computer program accepted in his field of study to solve the calculations does not necessarily render those calculations unreliable. As stated by the circuit court judge during trial, it is not unusual for an expert to employ a computer program to assist in performing complicated mathematical calculations. Tanner testified that the program he utilized was widely used and accepted in the engineering field.

Appellants argue that Tanner was not employed as an expert until approximately three years after the accident in question occurred. They claim that because he did not visit the scene, did not review the vehicles or pictures of the vehicles in question, or examine any black box data from the vehicles, did not interview any of the parties, or take any measurements of the scene, he does not have sufficient facts or data with which to make his opinion. They claim there is no factual basis to support his equations. However, these arguments all go to the weight of the evidence, not the admissibility. *See Clephas v. Garlock, Inc.*, 168 S.W.3d 389, 394 (Ky. App. 2004); *City of Nicholasville Police Department v. Abraham*, 565 S.W.3d 639, 645 (Ky. App. 2018).

Appellants' counsel did, in fact, cross-examine Tanner thoroughly on these matters during the trial. It should also be noted that the circuit court properly limited Tanner's testimony; he was not allowed to testify as to his conclusion

stated in his report, which was that the force of the accident did not cause the Appellants' injuries. The circuit court ruled this was a conclusion within the realm of medical causation, to which Tanner was not qualified to testify. We do not believe the court abused its discretion in allowing Tanner's testimony at trial.

Appellants still argue the circuit court erred in not allowing them to have Tanner perform his calculations in front of the jury. "[Q]uestions concerning the scope of evidence are left to the discretion of the trial court to determine whether to admit and exclude evidence." *Baptist Healthcare Systems, Inc. v. Miller*, 177 S.W.3d 676, 684 (Ky. 2005). The circuit court determined that because solving the equations by hand was not how Tanner solved the equations in reaching his conclusion, it had little probative value, especially considering the amount of time it would take. "The trial court also has 'discretion 'to . . . control . . . the amount of evidence produced on a particular point.'" *Addison v. Addison*, 463 S.W.3d 755, 762 (Ky. 2015) (citations omitted).

Tanner informed the court that it was possible for him to do the calculations by hand in front of the jury; however, it would take between one to two hours and many sheets of paper. We do not believe the circuit court abused its discretion in its ruling. Waste of time is properly avoided. KRE 403. A trial court "is vested with a large discretion in the conduct of the trial of causes and an appellate court will not interpose to control the exercise of such discretion by a

court of original jurisdiction, unless there has been an abuse or a most unwise exercise thereof." *Transit Auth. of River City (TARC) v. Montgomery,* 836 S.W.2d 413, 416 (Ky. 1992).

### The Circuit Court Did Not Err in Barring the Word "Insurance" in the Presence of the Jury

Appellants argue the circuit court's prohibition against mentioning "insurance" prejudiced their cross-examination of Tanner. Appellants allege they wished to question Tanner regarding his history of testifying as an expert for insurance companies.

The Appellants have not properly preserved this issue. Their citation in their brief to where they objected to the prohibition was during the testimony of Dr. Lach, not Tanner. At no point during Tanner's testimony did Appellants bring up the possibility of bias based upon any history with an insurance company. "[T]he critical point in preservation of an issue remains: was the question fairly brought to the attention of the trial court." *MV Transp., Inc. v. Allgeier*, 433 S.W.3d 324, 331 (Ky. 2014).

Likewise, during pretrial motions, when Berger's counsel moved to exclude the use of the word "insurance," the only argument Appellants' counsel made is that he likes to ask if any potential jurors work for an insurance company during voir dire.

Nowhere in the record do Appellants express their wish to cross-examine Tanner as to any bias he may have by his history of working with insurance companies. Appellants' counsel did, in fact, ask Tanner if he ever worked as an expert for plaintiffs and what percentage of his cases testifying as an expert would be attributed to plaintiffs. Thus, the Appellants exposed any bias Tanner may have had for the jury to consider. They make no reference as to what precisely would have been asked or what the testimony would have been had they been allowed to use the term "insurance" in their line of questioning. At any rate, we determine that even if the circuit court erred in barring any use of the word "insurance," it was harmless. An error is harmless if it does not affect the substantial rights of the parties. *Morgan v. Scott*, 291 S.W.3d 622, 637 (Ky. 2009).

### The Circuit Court Did Not Err in Allowing Muya to be Impeached with Prior Deposition Testimony from Another Case

Appellants allege it was error for the circuit court to allow Berger's counsel to cross-examine Muya regarding deposition testimony he gave in an unrelated civil matter. They argue this deposition was never disclosed in discovery and therefore, should have been excluded. We find this argument to be without merit.

CR 32.01 governs the use of depositions in court proceedings. Subsection (a) states: "*Any* deposition may be used by any party for the purpose of

contradicting or impeaching the testimony of deponent as a witness." (Emphasis added.)

"A trial court has broad discretion in ruling upon the admissibility of impeaching evidence . . . . The law favors the admission of evidence that is relevant to a jury's determination of a witness's credibility." *MV Transp., Inc.*, *supra*, at 333. "[T]he credibility of any witness, including one's own witness, may be impeached by showing that the witness has made prior inconsistent statements. This rule applies in both criminal and civil proceedings." *Wise v. Commonwealth*, 600 S.W.2d 470, 472 (Ky. App. 1978). "The credibility of a witness' relevant testimony is always at issue, and the trial court may not exclude evidence that impeaches credibility even though such testimony would be inadmissible to prove a substantive issue in the case." *Sanborn v. Commonwealth*, 754 S.W.2d 534, 545 (Ky. 1988), *receded on other grounds by Hudson v. Commonwealth*, 202 S.W.3d 17 (Ky. 2006). "It is well-settled that prior inconsistent statements by a witness may be received as substantive evidence." *Porter v. Commonwealth*, 892 S.W.2d 594, 596 (Ky. 1995).

The court did not abuse its discretion in allowing this line of questioning by Berger. While the circuit court had previously ruled that any mention of subsequent motor vehicle accidents and lawsuits should be excluded as irrelevant, it properly balanced Berger's ability to impeach Muya with his prior

testimony while still excluding the fact that this deposition testimony came from a separate action. Berger's counsel was able to ask about the testimony without eliciting explicitly where it came from. Moreover, Berger did not introduce these statements as substantive evidence, but only to impeach Muya's credibility. It was not an abuse of discretion for the circuit court to allow this line of questioning.

## CONCLUSION

Because the circuit court did not abuse its discretion in its evidentiary rulings during the jury trial, the Jefferson Circuit Court is AFFIRMED.


ALL CONCUR.


BRIEFS FOR APPELLANTS:

Michael A. Landisman
Louisville, Kentucky

BRIEF FOR APPELLEE LISA BERGER:

Scott A. Davidson
Louisville, Kentucky